403 So.2d 331 (1981)
Beauford WHITE, Appellant,
v.
STATE of Florida, Appellee.
No. 54292.
Supreme Court of Florida.
March 20, 1981.
Rehearing Denied September 29, 1981.
*332 Leonard Frishman, Sp. Asst. Public Defender, Coral Gables, David Goodhart and *333 Thomas G. Murray, Sp. Asst. Public Defenders, Miami, for appellant.
Jim Smith, Atty. Gen., and Margarita Esquiroz and Calvin Fox, Asst. Attys. Gen., Miami, for appellee.
PER CURIAM.
Defendant Beauford White was convicted of six counts of first-degree murder, two counts of attempted first-degree murder, and four counts of robbery. The trial judge imposed the death sentence, thus vesting appellate jurisdiction in this Court pursuant to article V, section 3(b)(1), Florida Constitution.
The essential facts of this case are not in dispute. On July 27, 1977, at approximately 8:15 p.m., an adult black male, posing as an employee of the power company, requested permission from Margaret Wooden to enter her home and check the electrical system. After being allowed in and checking outlets in several rooms, the intruder drew a gun and proceeded to tie Ms. Wooden's hands behind her back and blindfold her. The intruder, who identified himself to her as "Lucky" and was later identified as John Ferguson, asked Ms. Wooden for drugs, money and jewelry and began searching the premises. Ferguson's coconspirators, defendant and Marvin Francois, soon entered the house. Both of these men were also armed and all three donned masks covering their faces from the nose down. The three ransacked the house looking for valuables until about an hour later when the owner of the house, Livingston Stocker, and five of his friends arrived. Upon their arrival, Stocker and his friends were forced to lie facedown on the floor while their hands were tied behind their backs. A short time later, Ms. Wooden's boyfriend arrived at the house and he too was tied up. At gunpoint the victims were asked for money and drugs, and one by one were searched. At some point during the ordeal the mask of one of the intruders fell from his face and a discussion ensued as to the need for killing the victims. Following this discussion, Ms. Wooden and her boyfriend were moved back to the bedroom while the other six victims were held captive in the living room. Ferguson then shot Ms. Wooden and her boyfriend in the back of the head while Francois systematically shot the other six victims in the head. Miraculously, Ms. Wooden and a Johnnie H. Hall survived and testified at the trial of defendant. At trial, Hall was able to identify the defendant as one of the intruders, but both Hall and Ms. Wooden identified the other two intruders as the persons who did the actual shooting.
A fourth participant in these crimes, Adolphus Archie, testified on behalf of the state in return for being allowed to plead guilty to reduced charges. Archie, who served as the "wheelman" and never entered the house, identified the defendant as a participant in the criminal scheme. Archie testified that he and defendant had been requested to participate in the "ripoff of a dope man" but were instead duped into participating in what he said was a planned contract murder of Stocker and perhaps other persons for drug-related reasons. Following the slayings, Archie testified that he met the other three at defendant's motel room where the proceeds of the robberies were divided among them. He testified that the defendant was upset and refused to participate in the disposal of the weapons.
The defendant was arrested on September 2, 1977 and confessed to his participation in the criminal episode. His detailed account of what had occurred was consistent with the trial testimony of the surviving victims. The defendant was also linked to the scene of the crimes by a single partial fingerprint which was lifted from the dust cover of a stereo set in the house. This fingerprint was identified by police as the fingerprint of the defendant.
Prior to trial the defendant moved to suppress his confession alleging that it was involuntarily induced by physical and mental abuse, threats and false promises of immunity. The trial court conducted a hearing into the matter and found that the defendant had made the statement voluntarily and with a full understanding of his *334 constitutional rights. The case proceeded to trial, with the defendant being tried separately upon his motion for severance of trial. The jury returned guilty verdicts on all counts for first-degree murder, attempted first-degree murder and robbery. At the penalty phase of trial, the only mitigating evidence presented on behalf of defendant was the testimony of his mother who noted that her son suffered from epilepsy and ulcers. The twelve-member jury unanimously recommended that a sentence of life imprisonment be imposed. The court ordered a presentence investigation and upon receipt of the report sentenced the defendant to the death penalty.
The defendant raises nine points on his appeal. The issues have been well briefed by the parties and carefully considered by this Court. Only four of the points raised, however, warrant discussion in this opinion. The other points have been considered and are rejected as being without merit.

I
In Point V of his brief the defendant asserts that the trial court committed reversible error in failing to suppress witness Hall's surprise identification of defendant at trial and in denying his motion for a mistrial. Counsel for defendant concedes that the state did not know that Hall would identify the defendant at trial but argues that had the state anticipated that an in-court identification would be possible at the last minute, a proffer outside the presence of the jury should have been made to provide defendant an opportunity to object and request a Richardson inquiry.[1]
Through discovery, counsel for defendant had learned that Hall had not been able to make a pretrial identification of defendant. Hall said at a pretrial deposition, however, that "If I see him, it's possible in the flesh I will be able to identify him." When asked at trial whether he recognized anyone in the courtroom who was in the house at the time the shootings took place, Hall pointed to the defendant. Counsel for defendant objected and the jury was dismissed while a hearing was conducted to determine whether the state violated the rules of discovery. At this hearing testimony was received from Hall and Detective Robert Derringer, lead investigator of the case. Hall reiterated the testimony given at his deposition that he might be able to identify defendant if he saw him in person. Detective Derringer testified that he had shown Hall hundreds of photographs but, to the best of his knowledge, had never shown him any photographs of the defendant, who did not become a suspect in the murders until shortly before his arrest. At the conclusion of the hearing the trial court concluded that there had been no discovery violation and postponed further examination of Hall until counsel for defendant had an opportunity to examine his deposition and prepare for cross-examination.
We have reviewed the record and conclude there is no merit to the argument that the state violated the rules of discovery. The state had not informed the defendant prior to trial that Hall would be unable to make an in-court identification of him, only that no pretrial identification had been made. The defendant was as privy to the possibility of an in-court identification as the state. The defendant had an opportunity to object when the prosecuting attorney asked Hall whether he recognized anyone in the courtroom, and immediately upon objection the trial court properly conducted a full Richardson inquiry into the circumstances surrounding the alleged discovery violation.[2]
In connection with Point V, the defendant also argues that Hall's in-court identification of defendant was, in essence, incompetent because he did not have an adequate opportunity to observe the defendant during the night of the slayings *335 and was taking medication at the time of trial. The defendant points out that the intruders wore masks partially concealing their faces and that Hall admitted having taken drugs and consumed alcohol the night the crimes were committed.[3] While these facts may go to the weight or credibility of Hall's testimony, they do not, in our opinion, render Hall's testimony so tenuous and speculative as to be incompetent.[4]
Finally, the defendant's argument in Point V focuses on the theory that Hall's in-court identification of defendant was somehow tainted by pretrial events. Defendant cites Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), and other United States Supreme Court[5] and Florida decisions[6] for the proposition that identification testimony must be suppressed unless the state can demonstrate that the in-court identification of the defendant rests upon an independent and untainted foundation. These cases, however, deal with situations where unconstitutionally suggestive pretrial identification procedures taint the in-court identification. In such situations due process requires the state to show that the witness's in-court identification rests on his independent observation of the defendant at the scene of the crime rather than on the impermissibly suggestive pretrial procedures. But in the situation here there was no pretrial confrontation which might have impermissibly tainted his in-court identification. Detective Derringer testified that he had never shown any photographs of the defendant to Hall and the defendant had refused to participate in a pretrial lineup upon the advice of his counsel. The line of cases cited by the defendant are, therefore, inapposite. We conclude that Point V of the defendant's argument on appeal is without merit.

II
In Point VIII, the defendant contends that the Florida death penalty statute violates the eighth amendment prohibition against cruel and unusual punishment under the United States Constitution in that it permits the infliction of death upon a defendant who lacks a purpose to cause the death of his victim. Defendant cites as authority Justice White's dissenting opinion in Lockett v. Ohio, 438 U.S. 586, 625, 98 S.Ct. 2954, 2973, 57 L.Ed.2d 973 (1978), wherein Justice White states: "The value of capital punishment as a deterrent to those lacking a purpose to kill is extremely attenuated." In a related argument, the defendant also contends that Florida's death penalty statute violates the fourteenth amendment guarantee of equal protection of the laws because of unequal treatment of a person convicted of first-degree murder caused during the commission of certain dangerous felonies. In such a situation the individual enters the sentencing hearing with one aggravating circumstance already in existence, see section 921.141(5)(d), Florida Statutes (1977), while in contrast the individual who has committed murder with a premeditated design to take the life of his victim has no such aggravating circumstance held against him.[7] Thus, *336 continues defendant's argument, the state is irrationally required to prove the existence of at least one or more statutory aggravating circumstances to obtain a death sentence where the murder is committed with premeditation but not where it is committed without design during the commission of certain felonies. See State v. Dixon, 283 So.2d 1 (Fla. 1973).
First, we note that we have already decided the reasonableness of taking into account as an aggravating circumstance the fact that the murder was committed during the commission of another serious felony. See State v. Dixon. Second, the defendant's argument overlooks the plurality opinion in Lockett v. Ohio, which states that the Constitution neither forbids a state from enacting felony-murder statutes nor from making aiders and abettors equally responsible with principals. Id. at 602, 98 S.Ct. at 2963. In response to Justice White's argument that a defendant must possess an intent to cause the death of the victim to impose the death penalty, Justice Rehnquist in a separate opinion stated that centuries of common law doctrine establishing felony murder and the relationship between aiders and abettors would have to be rejected to adopt this view. Id. at 635, 98 S.Ct. at 2976. A majority of the United States Supreme Court obviously has not adopted the view that the death penalty may not constitutionally be imposed under the circumstances existing in the instant case. To the contrary, in striking down Ohio's death penalty statute because it limited consideration of relevant mitigating circumstances to those statutorily listed, the Court specifically distinguished Florida's death penalty statute by noting that it permitted the sentencer to consider any aspect of the defendant's character and record or any circumstance of his offense as an independently mitigating factor. Id. at 606-07, 98 S.Ct. at 2965-66. Thus, at least implicitly, the Court recognized the continuing vitality of Proffitt v. State, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), upholding the constitutionality of Florida's death statute, in the context of a claim which was similar to the eighth amendment claim raised by the defendant in the instant case.
Furthermore, the fact that the mitigating circumstances listed in section 921.141(6), Florida Statutes (1977), are not exclusive removes much of the force of the defendant's equal protection argument. A defendant remains free to argue as a mitigating circumstance that he did not intend to kill the victim or that he did not act as the triggerman. The mitigating factors listed in the death statute merely indicate the principal factors to be considered. Peek v. State, 395 So.2d 492 (Fla. 1980); Songer v. State, 365 So.2d 696 (Fla. 1978).[8] Moreover, the mere existence of this aggravating circumstance does not mandate imposition of the death sentence. This Court has repeatedly emphasized that the death penalty statute does not contemplate a mere tabulation of x number of aggravating and y number of mitigating circumstances, but rather contemplates a reasoned weighing of those circumstances to determine whether the death sentence is appropriate. Hargrave v. State, 366 So.2d 1 (Fla. 1978); State v. Dixon, supra.

III
The defendant asserts in Point VII of his brief that the evidence presented at trial was insufficient as a matter of law to sustain his convictions. We have carefully reviewed the record and hold that there is ample evidence to sustain defendant's convictions.

IV
We now turn to the issues raised by defendant with respect to the imposition of the death penalty. We will first review the trial court's findings on the existence of the aggravating and mitigating circumstances, *337 and then determine the propriety of the trial court's death sentence following the jury recommendation of life.
The trial judge found that all eight of the aggravating circumstances listed in section 921.141(5)(a) (h), Florida Statutes (1977), applied to the defendant. The trial judge found that none of the mitigating circumstances listed in section 921.141(6)(a) (g) applied and, in imposing the death sentence, concluded that no mitigating circumstances existed which could possibly outweigh the aggravating circumstances. The defendant contends that the trial judge erroneously applied certain of the aggravating circumstances to the facts of this case and failed to consider certain mitigating circumstances.
First, the defendant argues that he was not under a "sentence of imprisonment" at the time the capital felonies were committed within the meaning of section 921.141(5)(a), Florida Statutes (1977), because they were not committed while he was incarcerated or after he had escaped from incarceration. The defendant was, however, on parole at the time the crimes were committed. Parole does not terminate a sentence of imprisonment but rather is a continuation of the sentence. Aldridge v. State, 351 So.2d 942 (Fla. 1977), cert. denied, 439 U.S. 882, 99 S.Ct. 220, 58 L.Ed.2d 194 (1978); Sellers v. Bridges, 153 Fla. 586, 15 So.2d 293 (1943). Therefore, we find that the trial judge properly applied this aggravating circumstance.
Second, the trial judge properly found that the defendant had been previously convicted of a felony involving the use or threat of violence to the person. § 921.141(5)(b), Fla. Stat. (1977) (assault with intent to commit rape). We reject the defendant's contention that the trail judge relied on nonviolent drug-related convictions in making this finding.
Third, the defendant asserts that the trial judge improperly injected considerations not actually present in deciding that the defendant knowingly created a great risk of death to many persons under section 921.141(5)(c). In finding that this aggravating circumstance was applicable the trial judge said:
What would have happened had additional neighbors, delivery people or other friends appeared at the home for a visit can only be the subject of conjecture. Suffice it to say, that a total of six people were killed and two seriously wounded during the perpetration of this robbery.
We agree with defendant's assertion that a person may not be condemned for what might have occurred. The attempt to predict future conduct cannot be used as a basis to sustain an aggravating circumstance. Huckaby v. State, 343 So.2d 29 (Fla.), cert. denied, 434 U.S. 920, 98 S.Ct. 393, 54 L.Ed.2d 276 (1977). Furthermore, we disagree with the trial court's suggestion that this aggravating circumstance may be sustained based on what in fact occurred  the murder of six individuals. The murders were effected by a gunshot blast to the head. In each case the gun was discharged at close range and involved relatively little risk of injury to other persons in the room. There were six discrete homicides, each performed in an execution fashion. We therefore hold that subsection (5)(c) was improperly applied as an aggravating circumstance under the facts of this case. Cf. Lewis v. State, 377 So.2d 640 (Fla. 1979); Kampff v. State, 371 So.2d 1007 (Fla. 1979).
Fourth, the defendant concedes and we sustain the existence of the statutory aggravating circumstance that the capital felony was committed during the commission of a serious felony listed in section 921.141(5)(d), which in this case was a robbery. Nevertheless, we hold that this same circumstance cannot also constitute the basis for finding the existence of the aggravating circumstance listed in section 921.141(5)(f) (capital felony committed for pecuniary gain), as was done by the trial judge here. In Provence v. State, 337 So.2d 783 (Fla. 1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977), we disapproved such a doubling up of aggravating circumstances based on the same aspect of a *338 defendant's criminal conduct. See also Hargrave v. State, supra.
Next, the defendant argues that the trial judge improperly applied section 921.141(5)(e) (capital felony committed to avoid or prevent a lawful arrest or effect an escape from custody) to him because he could not have been attempting to avoid arrest when he was not aware that his cohorts had planned all along to kill the victims. The trial judge in his findings recognized that the defendant was opposed to the killings but also pointed out that he, nonetheless, stood by armed and allowed the shootings to take place. In Riley v. State, 366 So.2d 19 (Fla. 1978), we held that although this aggravating circumstance was concerned primarily with the killing of law enforcement officers, it could validly be applied when the victim was not a law enforcement officer if the dominant motive for murder was the elimination of witnesses. See also Menendez v. State, 368 So.2d 1278 (Fla. 1979). Here there was evidence presented that a "contract" was placed for the murder of at least one of the victims. However, as noted by the trial court in its sentencing order, the presence of as many as seven of the victims was not anticipated. After the mask of one of the intruders fell from his face the three intruders discussed the need for killing the victims. Although the defendant was opposed to the killings, he had fully participated in the robberies and did nothing to prevent or otherwise disassociate himself from the murders which then took place. Following the murders, the defendant voluntarily returned to his motel room with his co-felons and accepted his share of the proceeds taken during the robberies. There one of the intruders informed the wheelman Archie that it was "the St. Valentine's Day Massacre," but told him not to worry because "not one of them [the victims] should live." We conclude that there is sufficient evidence to sustain the trial judge's finding that the capital felonies were committed in an effort to avoid arrest by eliminating witnesses to the crime. Again, however, we disapprove of the trial judge's use of these same incidents as a basis for also finding that the capital felonies were committed for the purpose of hindering the lawful exercise or enforcement of the criminal laws of the state. See § 921.141(5)(g). As noted earlier, this doubling-up of aggravating circumstances violates the rule in Provence and we, therefore, hold that this aggravating factor must be stricken.
Finally, the defendant claims that the capital felonies were not "especially heinous, atrocious or cruel." The defendant relies on Cooper v. State, 336 So.2d 1133 (Fla. 1976), cert. denied, 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 239 (1977), where a police officer was killed when two shots were fired into his head. In Cooper, we reiterated the standard set forth in State v. Dixon, supra, in applying this aggravating circumstance. There we stated that while all murders are heinous, this aggravating factor contemplates the conscienceless, pitiless or unnecessarily torturous crime which is accompanied by such additional acts as to set it apart from the norm of capital felonies. In Cooper the defendant shot his victim immediately upon confronting him. The victim died instantly and painlessly, without any additional acts which made the killing heinous within the meaning of the statute. See also Riley v. State, supra. In contrast, the victims in this case were required to submit to a protracted ordeal during which time they undoubtedly agonized over the prospect of being murdered. The trial judge stated with reference to this aggravating circumstance:
Miss. [sic] Wooden was the first of the victims to be tied, gagged and blindfolded and she, for many hours was subjected to the taunts of the conspir[a]tors. During this ordeal she had to remain across the bed, laid on the floor or led around the house so constrained. She was terrified that any moment her baby might have been brought home and her boy friend might return from work. She was required to listen while Mr. Stocker and his five friends were confronted, tied, gagged and blindfolded. She eventually faced the frustration of hearing her boy *339 friend arrive home and knew he was being tied and gagged.
Ultimately, all eight victims were in one bedroom during which time this defendant continued to guard them and discuss with the other conspir[a]tors the searching of the house and captives, and the ultimate disposition of the bodies. The survivors testified as to their increased fright and anxiety when Miss. [sic] Wooden and her boy friend were placed in one room and Mr. Stocker and his five friends remained in Stocker's bedroom. Cold bloodedly, all eight victims were shot, six of whom received fatal wounds. Victim Stocker was heard to have cried to God for his assistance in stopping what he anticipated was going to take place. His prayers were interrupted by a shotgun blast to the back of his head. While each of the six men in Stocker's room were being shot, Miss. [sic] Wooden and her boyfriend were also being shot by another of the coconspir[a]tors in another room. Each of the victims was dispatched by a shot from either a shotgun or a pistol which was deliberately and callously discharged into the back of his head. Miraculously, one victim in each of the two groups survived to testify as to the ordeal. While these executions were carried out by individuals other than the instant defendant he, nevertheless, was present and did nothing whatsoever to stop the assaults, harassments and shootings.
We believe that the events surrounding the slayings in this case readily distinguish it from the slaying which occurred in Cooper and hold that the evidence sustains the trial judge's finding that these capital felonies were especially heinous, atrocious or cruel. In reaching our conclusion we note that we are also influenced by the magnitude of the criminal conduct. The calculated slaughter of six individuals and attempted slaughter of two others constitutes an atrocity which sets the capital felonies apart from the "norm" of capital felonies. Even one of the co-felons characterized the episode as "the St. Valentine's Day Massacre."
Next, the defendant maintains that the trial judge overlooked the mitigating circumstances that "[t]he defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor" (section 921.141(6)(d)) and that "[t]he defendant acted under extreme duress or under the substantial domination of another person" (section 921.141(6)(e)). We find absolutely no evidence to support the assertion that defendant acted under coercion or the domination of another. We also do not find that the defendant played a minor role as an accomplice. He fully participated in the subduing and intimidation of the victims, in ransacking the house looking for valuables and stood by while the victims were shot one by one. It was his motel room which was used as a place to plan the crimes and to divide the loot after the crimes were completed. The trial judge properly rejected the applicability of these two mitigating circumstances.
In conclusion, we note that although three aggravating circumstances were improperly found to exist there were no mitigating circumstances. Therefore, a new sentencing trial is not mandated by our decision in Elledge v. State, 346 So.2d 998 (Fla. 1977).

V
We next deal with the defendant's argument that the trial judge imposed the death sentence after a jury recommendation of life imprisonment in violation of Tedder v. State, 322 So.2d 908 (Fla. 1975). In Tedder we held that in order to sustain a sentence of death following a jury recommendation of life the facts suggesting a sentence of death must be so clear and convincing that virtually no reasonable person could differ.
In arriving at a conclusion contrary to the jury recommendation the trial judge noted that as a result of the presentence investigation and information presented at sentencing he was made aware of a number of factors which the jury did not have an *340 opportunity to consider.[9] Among these factors were the defendant's prior conviction of a violent felony (attempted rape) and the fact he was still on parole at the time the offenses in this case were committed (aggravating circumstances (5)(a) and (5)(b) supra), which circumstances were not established before the jury but were established before the judge at the time he rendered sentence. The trial judge also found that the defense counsel's vivid description to the jury on the effects of being electrocuted was calculated to influence a life sentence through emotional appeal. The court concluded that the death sentence was appropriate in light of the overwhelming aggravating circumstances which far outweighed any possible mitigating circumstances. After careful deliberation we conclude that the death sentence is warranted.
Although the advisory recommendation of the jury is to be accorded great weight, the ultimate decision on whether the death penalty should be imposed rests with the trial judge. Hoy v. State, 353 So.2d 826 (Fla. 1977), cert. denied, 439 U.S. 920, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978). Death is presumed to be the proper penalty when one or more aggravating circumstances are found unless they are outweighed by one or more mitigating circumstances. State v. Dixon, supra. In this case the trial court properly found five aggravating and no mitigating circumstances under the death statute. The only colorable mitigating circumstance was the nonstatutory consideration that the defendant was not the triggerman. We do not believe, however, that this factor alone outweighs the enormity of the aggravating facts, especially in light of the defendant's full cooperation in the robberies and complete acquiescence in the cold-blooded systematic murder or attempted murder of eight individuals. We hold, therefore, that the trial judge imposed the death sentence consistently with Tedder. Cf. Dobbert v. State, 375 So.2d 1069 (Fla. 1979); Barclay v. State, 343 So.2d 1266 (Fla. 1977), cert. denied, 439 U.S. 892, 99 S.Ct. 249, 58 L.Ed.2d 237 (1978); Hoy v. State, supra; Sawyer v. State, 313 So.2d 680 (Fla. 1975), cert. denied, 428 U.S. 911, 96 S.Ct. 3226, 49 L.Ed.2d 1220 (1976).
Finally, the defendant urges this Court to overturn his death sentence based on our responsibility to review the cases to ensure that the death sentence is imposed consistently under similar circumstances. See State v. Dixon. The defendant focuses his argument, in particular, upon the fact that the wheelman, Archie, received only concurrent twenty-year sentences of imprisonment for his participation in the crimes. The defendant contends that his culpability is no greater than Archie's and notes the fact that neither had acted as the triggerman. The defendant refers us to Slater v. State, 316 So.2d 539 (Fla. 1975), where we found it necessary to reduce the death sentence of an accomplice when the jury recommended life imprisonment and the triggerman, who was identified, had received a life sentence and the wheelman had received a sentence of five years imprisonment. In our recent decision in Malloy v. State, 382 So.2d 1190 (Fla. 1979), we also found it necessary to reduce the death sentence of a defendant when his arguably equally culpable accomplices were permitted to plead guilty to lesser included offenses and there was conflicting evidence on who was the triggerman.
Our decisions in Slater and Malloy would perhaps warrant reversal of defendant's death sentence if the two participants who did the actual shooting in this case received something less than a death sentence. However, this is not the case. We take judicial notice that the other two intruders, Francois and Ferguson, have both been sentenced to death.[10] As to the disparate sentences *341 imposed on Archie and the defendant, we find that they are justified under the circumstances. In contrast to the active role played by defendant throughout the robberies and murders, Archie served only as the wheelman whose role was limited to driving the defendant and the two other intruders to Stocker's residence. He met with them again at the motel room after the entire episode was over. The defendant's moral and legal culpability was, in our opinion, much greater than Archie's. Hence, we cannot conclude based on our review of this case and other cases in which the death sentence was imposed, that the defendant has been treated differently upon substantially similar circumstances. We hold that the death sentence has been imposed on the defendant consistent with the equal administration of justice.
For the foregoing reasons, we affirm the conviction of the defendant on all counts as charged and affirm the imposition of the death sentence.
It is so ordered.
SUNDBERG, C.J., and BOYD, OVERTON, ENGLAND, ALDERMAN and McDONALD, JJ., concur.
ADKINS, J., concurs in result only.
NOTES
[1] See Richardson v. State, 246 So.2d 771 (Fla. 1971); Cumbie v. State, 345 So.2d 1061 (Fla. 1977).
[2] Thus this case is distinguishable from McClellan v. State, 359 So.2d 869 (Fla. 1st DCA 1978), which is relied on by defendant in support of his argument.
[3] The defendant also asserts that the witness Hall had vision problems since 1955 as a result of an accident. Hall, however, testified that the accident did not affect his normal vision.
[4] We note that Hall certainly had an extended opportunity to view the three intruders. A portion of Hall's pretrial deposition was read at the Richardson inquiry hearing and Hall was quoted as saying with regard to the defendant that "all I did was look at him... . [f]or the whole time he was in the house."
[5] United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).
[6] Baxter v. State, 355 So.2d 1234 (Fla.2d DCA), cert. denied, 365 So.2d 709 (Fla. 1978); Gibbs v. State, 344 So.2d 621 (Fla.3d DCA 1977); Hamilton v. State, 303 So.2d 656 (Fla.2d DCA 1974).
[7] Subsequent to defendant's trial, subsection (5)(i) has been added to the list of aggravating circumstances set forth in section 921.141, Florida Statutes (1979). Under this subsection it is an aggravating circumstance if:

The capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
[8] Indeed the death statute specifically lists as a mitigating circumstance the situation where the defendant played only a minor role as an accomplice in the commission of a capital felony. § 921.141(6)(d), Fla. Stat. (1977).
[9] The trial court, however, specifically noted that it did not consider any information not known to defendant or his counsel. Thus we do not confront a possible Gardner violation. See Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977); Songer v. State, 365 So.2d 696 (Fla. 1978).
[10] Francois and Ferguson presently have appeals pending in this Court. Francois v. State, No. 54,461, and Ferguson v. State, No. 55,137.