Beauford WHITE, Petitioner-Appellant,

v.

Louie L. WAINWRIGHT, as Secretary, Department of Corrections, State of Florida, Respondent-Appellee.

No. 86–5220.

United States Court of Appeals, Eleventh Circuit.

Jan. 20, 1987.

As Amended March 2, 1987.

Rehearing and Rehearing En Banc Denied Feb. 23, 1987.

Thomas G. Murray, Asst. Public Defender, Miami, Fla., for petitioner-appellant.

Calvin Fox, Asst. Atty. Gen., Miami, Fla., for respondent-appellee.

Before GODBOLD, HILL and ANDERSON, Circuit Judges.

GODBOLD, Circuit Judge:

Petitioner Beauford White is a Florida state prisoner under a death sentence following conviction of six counts of first degree murder committed in 1978. The district court denied habeas corpus relief. We affirm.

The major issue concerns application of *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), which prescribed constitutional limits on imposing the death sentence for murder upon a defendant who has participated in a felony in the course of which the murder was committed by other participants. In the *Enmund* decision the Supreme Court held that the death sentence imposed on Enmund was unconstitutional under the Eighth Amendment because he himself did not kill, or intend that the victims be killed, and did not anticipate that lethal force would be used.

White participated in a robbery during which eight victims were shot, six fatally. There is no evidence that he was a shooter, but he was armed and on the scene as an active participant in other respects and in this appeal does not deny that participation.

But he contends that he neither knew nor anticipated that deadly force would be used and, indeed, was duped into participating in the robbery by the two shooters who, unknown to him, were committing the robbery as an incident to a drug-dispute contract to kill two of the victims. The district court held that *Enmund* did not protect White from the death penalty.

White confessed to his participation in the robbery. He was convicted in 1978. Two victims, Margaret Wooden and Johnnie Hall, had survived despite being shot in the head, and they testified. A fourth actor, Adolphus Archie, who had driven the three robbers to the home of Livingston Stocker where the robbery occurred, also testified pursuant to a plea agreement. The jury recommended life imprisonment for White, but the trial judge imposed death.

White's conviction was affirmed in 1981 by the Florida Supreme Court. *White v. Florida*, 403 So.2d 331 (1981), *cert. denied*, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983). The court found the historical facts as follows:

On July 27, 1977, at approximately 8:15 p.m., an adult black male, posing as an employee of the power company, requested permission from Margaret Wooden to enter her home and check the electrical system. After being allowed in and checking outlets in several rooms, the intruder drew a gun and proceeded to tie Ms. Wooden's hands behind her back and blindfold her. The intruder, who identified himself to her as "Lucky" and was later identified as John Ferguson, asked Ms. Wooden for drugs, money and jewelry and began searching the premises. Ferguson's coconspirators, defendant and Marvin Francois, soon entered the house. Both of these men were also armed and all three donned masks covering their faces from the nose down. The three ransacked the house looking for valuables until about an hour later when the owner of the house, Livingston Stocker, and five of his friends arrived. Upon their arrival, Stocker and his friends were forced to lie facedown on

the floor while their hands were tied behind their backs. A short time later, Ms. Wooden's boyfriend arrived at the house and he too was tied up. At gunpoint the victims were asked for money and drugs, and one by one were searched. At some point during the ordeal the mask of one of the intruders fell from his face and a discussion ensued as to the need for killing the victims. Following this discussion, Ms. Wooden and her boyfriend were moved back to the bedroom while the other six victims were held captive in the living room. Ferguson then shot Ms. Wooden and her boyfriend in the back of the head while Francois systematically shot the other six victims in the head. Miraculously, Ms. Wooden and a Johnnie H. Hall survived and testified at the trial of defendant. At trial, Hall was able to identify the defendant as one of the intruders, but both Hall and Ms. Wooden identified the other two intruders as the persons who did the actual shooting.

A fourth participant in these crimes, Adolphus Archie, testified on behalf of the state in return for being allowed to plead guilty to reduced charges. Archie, who served as the "wheelman" and never entered the house, identified the defendant as a participant in the criminal scheme. Archie testified that he and defendant had been requested to participate in the "ripoff of a dope man" but were instead duped into participating in what he said was a planned contract murder of Stocker and perhaps other persons for drug-related reasons. Following the slayings, Archie testified that he met the other three at defendant's motel room where the proceeds of the robberies were divided among them. He testified that the defendant was upset and refused to participate in the disposal of the weapons.

The defendant was arrested on September 2, 1977 and confessed to his participation in the criminal episode. His detailed account of what had occurred was consistent with the trial testimony of the surviving victims. The defendant was also linked to the scene of the crimes by a single partial fingerprint which was lifted from the dust cover of a stereo set in the house. This fingerprint was identified by police as the fingerprint of the defendant.

*Id.* at 333. Later in its opinion the Supreme Court recognized:

> The trial judge in his findings [supporting imposition of the death penalty] recognized that the defendant was opposed to the killings but also pointed out that he, nonetheless, stood by armed and allowed the shootings to take place.

*Id.* at 338. The court also noted other findings made by the trial judge in imposing the death sentence:

> Victim Stocker was heard to have cried to God for his assistance in stopping what he anticipated was going to take place. His prayers were interrupted by a shotgun blast to the back of his head.

> \* \* \* \* \* \*

> While these executions were carried out by individuals other than the instant defendant he, nevertheless, was present and did nothing whatsoever to stop the assaults, harassments and shootings.

*Id.* at 339.

The Supreme Court did not apply *Enmund* to these facts because that case was not decided until the following year.

In 1984 a death warrant was signed. White then filed a 3.850 petition for postconviction relief in the Florida trial court. The court stayed the execution and then granted relief on the ground that the death sentence was impermissible under *Enmund*. The court found that White, though present at the scene of the robbery and participating therein, neither killed nor intended to kill nor anticipated that lethal force would be used. On appeal the Florida Supreme Court reversed the trial court, *Florida v. White*, 470 So.2d 1377 (Fla. 1985), with two justices dissenting on *Enmund* grounds. The court summarized in shortened form the facts it had found in the direct appeal. It specifically found:

At some point the mask of one of the two co-conspirators fell from his face. The three conspirators discussed the need for killing the victims with appellee verbally opposing the killings.

*Id.* at 1380.

In the 3.850 appeal the Florida Supreme Court distinguished *Enmund* on these grounds: First, Enmund was never present at the robbery/murder scene but remained in an automobile several hundred feet away, whereas White was present before, during and after the robbery and the murders. Second, Enmund had no active role in the actual robbery or murders, whereas White was armed and participated fully in capturing, intimidating and guarding the robbery/murder victims. Third, Enmund did not contemplate or intend that lethal force would be used in carrying out the robbery, but, while White verbally opposed the killings during a discussion preceding the murders, he did nothing to disassociate himself from either the murders or the robbery but rather, "After the discussion relative to killing the victims, whatever [White] might have originally intended or contemplated about lethal force being used in the robbery, it can hardly be said that he did not realize that lethal force was going to be used in carrying out the robbery." 470 So.2d at 1380. The court referred to other findings it had made on White's direct appeal. In that decision it had rejected his contention that he played a minor role and acted under duress or domination of another but had found instead that he fully participated in subduing and intimidating the victims and in ransacking the house looking for valuables, that he stood by while the victims were being shot, and that his room had been used as a place to plan the robbery[1] and to divide the loot after the crimes were completed.

A new death warrant was issued August 22, 1985 setting execution for September 30, 1985. White filed a federal petition for habeas corpus on August 30. The district court, Stanley Marcus, district judge, handled the case with admirable restraint, dignity and judgment. He heard oral argument on September 3 and more extended argument on September 13. Parts of the state court record were missing; Judge Marcus ordered the state to complete the record, and it did so on September 20. On September 23 the district court found that a stay of execution was necessary to permit a fair and thorough consideration of the merits of the petition prior to the date of execution. In March 1986 Judge Marcus entered a meticulous opinion, 55 pages in length, in which he carefully and precisely analyzed and considered each of White's contentions, discussed the applicable law, examined the state court record, and, with full explanation of reasons, denied relief. *White v. Wainwright,* 632 F.Supp. 1140 (S.D.Fla.1986). We find no error in his decision.

## I. THE ENMUND ISSUE

■ *Enmund* itself tells us that we look at the state court proceedings to determine whether the accused contemplated or intended that life be taken.

The district court correctly perceived that under 28 U.S.C. § 2254(d), *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), and *Cabana v. Bullock,* —— U.S. ——, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), findings of fact made during state court proceedings are presumed to be correct unless one of the conditions set out in § 2254(d) is found to exist. The district judge quoted the findings made by the Florida Supreme Court in the direct appeal that we have quoted above. He found that in the 3.850 appeal the Supreme Court

has made a particularized and individualized analysis of the culpability of the Petitioner, Beauford White, and found sufficient factual basis to support the imposition of the death penalty.

632 F.Supp. at 1149. The district court found that the Supreme Court had made

---

1. The Florida Supreme Court said "plan the crimes," 470 So.2d at 1380, but this is an evident slip in phraseology. We are not able to find in the record any evidence that any crime other than the robbery was planned there and the state has referred us to none.

the following findings that were relevant under *Enmund:*

> first, that Petitioner did come to realize lethal force would be used in carrying out the robbery, and that this occurred, at the latest, when the mask fell off the face of one of his accomplices; and second, that there was no evidence to support the assertion that Petitioner acted under the coercion or domination of another. Put differently, the Supreme Court of Florida found that Beauford White came to know, realize or contemplate that lethal force would be used and freely chose to stay and participate, guarding the front door of a small cinderblock house as eight people were systematically shot in the back of the head, six fatally, and thereafter fled the scene of the crime with the two shooters, all of whom returned to his motel room where all of the loot generated from the robbery/murders was divided up. Putting together these two critical findings of fact—knowledge that deadly force would be used, and his voluntary participation throughout—we read the Florida Supreme Court opinion to amount to a finding of the requisite criminal intent or *mens rea.* Indeed, we think the Supreme Court of Florida's opinion can only be read as a finding that the Petitioner Beauford White's participation in the events preceding, during and following the murders was voluntary and that he possessed the necessary intent even though he voiced opposition at one point to the murders.

*Id.* at 1149–50.

The district court concluded that it need answer only two questions: "First, did the Florida Supreme Court make an *Enmund* finding of the requisite criminal intent; and second, does the record fairly support that finding." It answered both questions "yes." *Id.* at 1150.

The court then applied § 2254(d). It impliedly found that none of the first seven conditions of § 2254(d) existed, and petitioner does not claim this was error. Rather the court examined the state court record and found that, based upon the record, the Supreme Court of Florida "could fairly find that Petitioner contemplated deadly force would be used to effect the robbery." 632 F.Supp. at 1152. Neither the Supreme Court nor the district court found that White himself used lethal force or intended himself to use lethal force, thus the case turned upon White's intent or contemplation that lethal force would be employed by others.

Along with accepting the historical underlying facts as found by the Florida courts and the factual conclusion that White contemplated that lethal force would be used, the district court made additional findings of its own that support the factual finding that White contemplated lethal force. The court found that White knew that the plan was to rob a "dope house," and also found, given the likelihood that the parties involved would be armed and that large sums of money and quantities of narcotics often were involved in such encounters, that the foreseeability of lethal force amounted to a near certainty. Thus, the court found, White began his participation in the robbery scheme with ample reason to anticipate deadly force.[2] The court also found that in the meeting held in White's hotel room before the robbery, at which the robbery was planned, White saw a sawed off shotgun and shotgun shells[3] and two pistols and took possession of and carried one of the pistols.

---

**2.** As it turned out, the victim Stocker, in whose home the robbery occurred, was carrying a pistol. The intruders, lying in wait inside the house, got the drop on him and his companions as they entered, and his pistol was never drawn. In Stocker's bedroom the intruders found (and took) a shotgun or a rifle and two more pistols. Stocker was seized and trussed up before he got to his bedroom.

**3.** The district court says the record evidence "suggests" that White knew how many shotgun shells Francois had. 632 F.2d at 1153. In fact, White's written confession said Francois had two, three or four shells at the motel and that Francois obtained more shells that were found at the house. A majority of the victims were shot with the shotgun.

The district court developed other important facts not touched upon by the state court, that during the robbery and before the killings began actual death threats were made in White's presence. The three intruders were in the house from two to two and one-half hours before the killings were committed and they fled. The district court found:

> The record further supports a finding that White came to realize fully that lethal force would be used. The transaction itself lasted a substantial period of time, indeed, a number of hours and the contemplation of deadly force undoubtedly intensified with each passing hour. The evidence is that Beauford White remained throughout, was armed throughout and directly and personally participated in subjugating eight individuals as they entered, were bound and gagged, forced to lie face down on the floor of various rooms in the small cinderblock house, and threatened with death. At one time during the course of this brutal armed seizure of the house and the subjugation of its occupants, a shotgun was placed to the head of one of occupants, Margaret Wooden, who testified that one of the co-defendants, not White, pointed the gun at her head and said: "We have to start with this little girl and then kill all of you." (T.R. at 727). Stocker, the object of the robbery/murder indicated that if he had anything, he would give it to them. Miss Wooden testified further that she heard another victim say, "if we had anything else, we will give it to you" and a defendant say "[s]orry, but its got to be this way." (T.R. at 730).

632 F.Supp. at 1153.[4] Substantially all of the events occurred in three connecting rooms of a small, one-story, concrete block house.

White relies strongly upon the trial judge's findings, made in imposing the death penalty and carried forward into the two decisions of the Supreme Court of Florida, that he "opposed" the killings.[5] This comes from the testimony of Hall who said that he heard three voices of persons he could not see, coming from the family room, with one voice, not that of White, saying that everyone must be killed and the other two voices opposing it.[6] White also relies upon testimony by Archie that after the killings White was in a state of shock and, some days later, denied knowing that any killing would occur.

The death threats, described by the district court in its findings quoted above from 632 F.Supp. at 1153 and embracing killing of all the victims, support the district court's conclusion that White came to realize fully that lethal force would be used. The record supports an inference that these threats occurred before the mask-slipping incident and followed a discussion between the intruders that they suspected there was additional loot they were not finding. There is no evidence that White interposed any objection to these threats. At oral argument in the district court and before this court, counsel for White has suggested that these death threats were mere puffing, designed to make the robbery more fruitful. The argument is not very persuasive, since what was threatened was exactly what occurred. And, in any event, a trier of fact was not required to treat the statements as meaningless puffing.

White's arguments to us, though not specifically phrased in terms of § 2254(d)(8),

---

4. Also, the district court did not refer to this victim's accompanying question, "Why do you have to do it?" (T.R. at 751). Moreover, just before the first victim was shot, he cried out, "Lord have mercy. Man, please don't do what I think you are going to do." (T.R. 781).

5. In the district court the state acknowledged that the court was bound by this state court finding. Thus we do not re-examine it, though the evidence supporting it is thin.

6. In neither his oral nor his written confession did White refer to any such conversation. In his written confession he said that after Stocker's car had been searched by Ferguson he (White) suggested they leave and that the other two participants then went to the kitchen and were mumbling between themselves, and he did not know what they were talking about and was afraid to ask. (T.R. 942).

appear to urge that the record does not fairly support the state court findings and that findings independently made by the district court are plainly erroneous. We have already mentioned the state court finding that after the mask slipped White "objected" to the killings. Accepting this finding, it is merely one fact to be considered as part of the overall circumstances. White was knowingly participating in a robbery undertaking in which there was at least a substantial risk that lethal force would be used.[7] Ahead of time he saw the three weapons to be used, including a sawed off shotgun, which is especially lethal at short range, and ammunition for it. He went to the scene of the robbery armed. There he participated in subjugating, intimidating, trussing up and guarding the victims and guarding the front door and in looting and ransacking the house for valuables and for drugs. He remained there for some two to two and one-half hours while the others went in and out and ransacked the victims' cars. During the robbery other death threats were made to Wooden and Stocker and a shotgun was put to Wooden's head. The intent to use lethal force was reinforced by the statement made by one of the participants (to which White was found to have objected), testified to by Hall, after someone's mask slipped. Despite these signals that deadly force in fact would be used, White took no steps to leave the scene or disassociate himself from the carnage that followed. After the killings he helped to wipe the house clean of fingerprints. He turned over his gun to the co-conspirators who dropped it in a river, and he accepted his part ($200) of the loot in a division carried out in his motel room.

■ If the evidence establishes that an accused contemplates that lethal force will be inflicted by others in a joint robbery undertaking in which he is participating, the fact that during the undertaking he expresses opposition to the use of lethal force, or demurs or opts out of the use of such force, does not establish as a principle of law or as a necessarily controlling fact that he is *Enmund*-insulated. His opposition, asserted mid-way in the stream of events, is a piece of evidence but no more than that. A finder of fact may conclude, on a proper record, that what he knew and what he did spoke more loudly than what he said in a single utterance.

In *Ross v. Kemp*, 756 F.2d 1483 (11th Cir.1985) (en banc) we considered the possibility that appellant was a non-shooter and that the fatal shot was fired by his accomplice. We declined to read *Enmund* in a mechanistic fashion but merely "as requiring a level of individual participation that justifies the application of the death penalty," *id.* at 1489, and we concluded that the primary purposes of capital punishment, deterrence and retribution, legitimately could be applied to the facts of the case. *Id.* We found, in the language of *Enmund*, that the defendant's "intentions, expectations and actions" rose to a level of culpability that the retributive purposes of capital punishment would be furthered by defendant's sentence. *Id.* And, in reaching these holdings, we considered not only the contemplation of lethal force but also the active participation by the defendant in the activities that culminated in the victim's death. *Id.*

This court also faced this issue in *Hall v. Wainwright*, 733 F.2d 766 (11th Cir.1984). Hall forced a victim into his car and his accomplice followed in another car. The victim was taken to a remote area, raped, and killed by a shot from Hall's gun, which he had acquired that day. Though there was no proof that Hall fired the shot, we held he had the intent to use lethal force.

## II. DOUBLE JEOPARDY

White contends that when the trial court, in the 3.850 proceeding, vacated the death penalty on *Enmund* grounds, its ruling was the functional equivalent of an acquit-

---

7. We do not place as much emphasis on this as did the district court, but it is nevertheless a fact entitled to consideration.

tal that barred appellate review under the double jeopardy clause of the Constitution, and the death penalty could not thereafter be reimposed on him. The Supreme Court rejected this theory and reimposed the death penalty. The same argument was made to the federal district court. The court pointed out that White had not been forced to twice run the gauntlet of trial but had only been unsuccessful in having his sentence vacated.

 The double jeopardy clause does not prevent government appeals providing that a retrial will not be required in the event the government is successful. *U.S. v. Wilson*, 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975). When a jury returns a verdict of guilty and the trial court thereafter enters a judgment of acquittal and an appeal is taken by the government, and the appellate court concludes that the judgment of acquittal was improper, the error can be corrected on remand by entry of a new judgment on the verdict. A new trial is not necessary. Thus double jeopardy does not apply. *U.S. v. Jenkins*, 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975).

 The finding of the trial court in the 3.850 proceeding is a finding that the state did not "prove its case" as one suitable for the death penalty, *see Poland v. Arizona*, — U.S. —, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986), but this post-trial finding was overturned by the Florida Supreme Court in an appeal that the state was entitled to take.

The district court correctly distinguished *Young v. Kemp*, 760 F.2d 1097 (11th Cir. 1985) (en banc) in which on appeal to this court we left undisturbed a trial court finding that there was insufficient evidence to support statutory aggravating circumstances and the double jeopardy clause therefore prevented the state from seeking the death penalty on retrial. In the present case the trial court's 3.850 finding that the evidence will not support the death penalty was eliminated on the appeal to the Florida Supreme Court. This situation is precisely covered by footnote 5 to the *Young v. Kemp* decision. *Id.* at 1101, n. 5.

## III. UNCONSTITUTIONAL APPLICATION OF AN AGGRAVATING CIRCUMSTANCE

 The trial court and the Florida Supreme Court found as an aggravating circumstance to justify imposing the death sentence that the homicides were "especially heinous, atrocious and cruel." This is drawn from § 921.141(5)(h), Florida Statutes. We already have held that (h) is applicable to these crimes in the appeal by Francois, who has since been executed. *Francois v. Wainwright*, 741 F.2d 1275 (11th Cir.1984); 763 F.2d 1188 (11th Cir. 1985). White urges that this aggravating circumstance cannot be, however, constitutionally applied to a non-triggerman and that such an application is overbroad. We do not agree. The *Enmund* case represents the constitutional limitation on the imposition of the death penalty on non-shooters. The findings we have made applying *Enmund* to this case indicate that White was sufficiently involved in these "especially heinous, atrocious and cruel" killings that the application of the death penalty to him is not unconstitutionally overbroad.

## IV. FAILURE TO CONSIDER MITIGATING CIRCUMSTANCES

 White contends that it is a mitigating circumstance that he was not the triggerman and that neither the trial court nor the Florida Supreme Court considered this non-statutory mitigating factor. In the direct appeal the Florida Supreme Court stated:

A defendant remains free to argue as a mitigating circumstance that he did not intend to kill the victim or that he did not act as the trigger man.

403 So.2d at 336. Later, at p. 339, the Supreme Court rejected the contention by White that "[t]he defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor' (section 921.141(6)(d)) and that '[t]he defendant acted under extreme duress or under the substantial domination of another person' (section 921.141(6)(e))." *Id.* at 339.

The federal district court considered this argument by White. First it noted that the trial judge, in his written findings relating to mitigating circumstances as specified by § 921.141(6), Fla.Stat.Ann., concluded that "No mitigating circumstances exist which could possibly outweigh the aggravating circumstances." The federal habeas judge concluded that the state courts had not ignored the evidence of the extent of White's involvement in the killings but rather had concluded that the evidence failed to rise to the level of mitigation. The record demonstrates that the district court did not err in this conclusion. Indeed, the record reveals that the trial judge, in his consideration of mitigating evidence, specifically noted that the "facts disclose that the defendant did not fire a fatal shot." As the district court correctly noted, it is the proper function of the sentencing court to determine the weight to be given this mitigating evidence.

The district court did not err in concluding that the state courts did not ignore the evidence of White's participation in the robbery/killings but rather found the evidence of that participation not to be mitigating.

The judgment of the district court is AFFIRMED.