**Beauford WHITE, Petitioner,**

v.

**Louie WAINWRIGHT, Respondent.**

**No. 85–2979–CIV.**

United States District Court, S.D. Florida.

March 31, 1986.

---

Thomas G. Murray, Asst. Public Defender, Eleventh Judicial Circuit of Florida, Miami, Fla., for petitioner.

Calvin Fox, Asst. Atty. Gen., Miami, Fla., for respondent.

## MEMORANDUM OPINION AND ORDER

MARCUS, District Judge.

Petitioner Beauford White, a State prisoner currently on death row, has filed this habeas corpus action pursuant to Title 28 U.S.C. Section 2254 challenging the imposi-

tion of the death sentence upon conviction of six counts of first degree murder.

At the core of this habeas corpus challenge is the contention that the imposition of the death sentence violates the flat command of *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and the Eighth Amendment to the United States Constitution which forbids the imposition of the death penalty on "one ... who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Id.* at 797, 102 S.Ct. at 3376. Three additional arguments are urged upon this Court: that the reimposition of the death penalty by the Supreme Court of Florida after it was vacated by the trial court on collateral attack violates the double jeopardy clause within the meaning of *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981); that Section 921.141(5)(h) of the Florida Statutes which establishes as an aggravating circumstance that a homicide was "especially heinous, atrocious or cruel" was both unconstitutionally vague and overbroad as applied to the facts of this case; and finally that both the trial court and the Supreme Court of Florida failed to give weight to the non-statutory mitigating circumstance that Petitioner was not a shooter.

On the facts of this case we find no constitutional infirmity in sentencing Beauford White to die and accordingly we DENY this petition for a writ of habeas corpus.

## I.

### A. *The Trial*

The procedural history of this case is straightforward and the facts are essentially uncontested. Only the inferences drawn from those facts are deeply in controversy. Petitioner Beauford White was charged in a twelve-count indictment with six counts of first degree murder, two counts of attempted first degree murder and four counts of robbery, along with Marvin Francois, John Errol Ferguson and Adolphus Archie. The Petitioner was tried alone upon his motion for severance and convicted on all twelve counts. Co-defendants Ferguson and Francois were tried separately, convicted of first degree murder and sentenced to die.[1] Adolphus Archie entered a plea of guilty and became a star witness for the State in connection with these prosecutions. The indictment itself charged Petitioner White along with the others with having unlawfully and feloniously, from a premeditated design to effect the death of a human being, or while engaged in the perpetration of, or in an attempt to perpetrate, robbery, with having killed six individuals by shooting them in the head with a deadly weapon, in violation of Florida Statute 782.04.

The trial judge, the Honorable Richard Fuller, instructed the jury about first degree murder on alternative theories of felony murder and premeditated murder. About vicarious murder the judge said:

A person may commit the crime of first degree murder by his own personal act or through another person. Any person who knowingly aids, abets, counsels, hires, or otherwise procures the commission of one of these enumerated felonies

---

1. The convictions and death sentence of Marvin Francois were upheld throughout the appellate process. *Francois v. State*, 407 So.2d 885 (Fla. 1981), *cert. denied*, 458 U.S. 1122, 102 S.Ct. 3511, 73 L.Ed.2d 1384 (1982); *Francois v. State*, 423 So.2d 357 (Fla.1982); *Francois v. Wainwright*, 741 F.2d 1275 (11th Cir.1984) (affirming denial of habeas corpus petition); *Francois v. State*, 470 So.2d 685, 687 (Fla.1985); *Francois v. Wainwright*, 614 F.Supp. 127 (S.D.Fla.1985) (denying second habeas corpus petition); *Francois v. Wainwright*, 763 F.2d 1187, 1188 (11th Cir.

1985), *reh. denied*, 765 F.2d 154 (11th Cir.1985). After nonsuccessful exhaustion of his appeals, Francois was executed on May 28, 1985.

John Ferguson's convictions for first degree murder were affirmed by the Florida Supreme Court which remanded the case for resentencing according to the mitigating circumstances relating to Ferguson's mental state. *Ferguson v. State*, 417 So.2d 639 (Fla.1982). The death penalty was again imposed and affirmed by the Florida Supreme Court. *Ferguson v. State*, 474 So.2d 208 (Fla.1985).

[including robbery] or the attempt thereof, resulting in the unlawful killing of the victim, and is physically present at commission of the enumerated felony or the attempt thereof, is "engaged in the perpetration of or the attempt to perpetrate" that enumerated felony and is equally guilty of the crime of first degree murder with the one who actually performs the criminal act.

(T.R. at 1363–64).

The court charged that for one person to be guilty of a crime physically committed by another it is necessary that he have a "conscious intent that the enumerated felony or the attempt thereof shall be committed," *id.*, and that pursuant to that intent he do some act or say some word which was intended to and did incite, cause, encourage, assist or induce another person to actually commit the enumerated felony.

The trial court also charged the jury on the meaning of premeditated murder and said, among other things, that "a premeditated design" was a "fully formed conscious purpose to take human life formed upon reflection and present in the mind at the time of the killing. The law does not fix the exact period of time which must pass between the formation of the intent to kill and the carrying out of the intent." (T.R. 1367–68). The trial court added that the time might be short and yet the killing premeditated if the fixed intent to kill was formed long enough before the actual killing to permit some reflection on the part of the person forming it, and that the person was at the time fully conscious of a settled purpose to kill.

Upon conviction on all counts, a separate and extensive sentencing hearing was held pursuant to Florida law and the trial jury unanimously recommended that the Petitioner be sentenced to life imprisonment. The trial judge however disregarded this recommendation and on April 27, 1978 sentenced Petitioner to die, entering written findings in support of the death sentence on May 23, 1978.

## B. *The Appeal*

On appeal, the Supreme Court of Florida affirmed the Petitioner's judgment and sentence. *White v. State*, 403 So.2d 331 (Fla. 1981). The essential facts are not in dispute and were found by the Florida Supreme Court on appeal to be the following:

On July 27, 1977, at approximately 8:15 p.m., an adult black male, posing as an employee of the power company, requested permission from Margaret Wooden to enter her home and check the electrical system. After being allowed in and checking outlets in several rooms, the intruder drew a gun and proceeded to tie Ms. Wooden's hands behind her back and blindfold her. The intruder, who identified himself to her as "Lucky" and was later identified as John Ferguson, asked Ms. Wooden for drugs, money and jewelry and began searching the premises. Ferguson's coconspirators, defendant and Marvin Francois, soon entered the house. Both of these men were also armed and all three donned masks covering their faces from the nose down. The three ransacked the house looking for valuables until about an hour later when the owner of the house, Livingston Stocker, and five of his friends arrived. Upon their arrival, Stocker and his friends were forced to lie facedown on the floor while their hands were tied behind their backs. A short time later, Ms. Wooden's boyfriend arrived at the house and he too was tied up. At gunpoint the victims were asked for money and drugs, and one by one were searched. At some point during the ordeal the mask of one of the intruders fell from his face and a discussion ensued as to the need for killing the victims. Following this discussion, Ms. Wooden and her boyfriend were moved back to the bedroom while the other six victims were held captive in the living room. Ferguson then shot Ms. Wooden and her boyfriend in the back of the head while Francois systematically shot the other six victims in the head. Miraculously, Ms. Wooden and a Johnnie H. Hall survived and testified at the trial of defend-

ant. At trial, Hall was able to identify the defendant as one of the intruders, but both Hall and Ms. Wooden identified the other two intruders as the persons who did the actual shooting.

A fourth participant in these crimes, Adolphus Archie, testified on behalf of the state in return for being allowed to plead guilty to reduced charges. Archie, who served as the "wheelman" and never entered the house, identified the defendant as a participant in the criminal scheme. Archie testified that he and defendant had been requested to participate in the "ripoff of a dope man" but were instead duped into participating in what he said was a planned contract murder of Stocker and perhaps other persons for drug-related reasons. Following the slayings, Archie testified that he met the other three at defendant's motel room where the proceeds of the robberies were divided among them. He testified that the defendant was upset and refused to participate in the disposal of the weapons.

The defendant was arrested on September 2, 1977 and confessed to participation in the criminal episode. His detailed account of what had occurred was consistent with the trial testimony of the surviving victims. The defendant was also linked to the scene of the crimes by a single partial fingerprint which was lifted from the dust cover of a stereo set in the house. This fingerprint was identified by police as the fingerprint of the defendant.

403 So.2d at 333.

On appeal Petitioner raised a variety of objections to the conviction, including the contention that the Florida death penalty statute violated the Eighth Amendment prohibition against cruel and unusual punishment in that it permitted the infliction of death upon a defendant who lacked a purpose to cause the death of his victim, relying upon the separate opinion of Justice White in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The Florida Supreme Court rejected that contention and rejected the rationale ultimate-

ly adopted by the Supreme Court of the United States in *Enmund v. Florida, supra*, noting that the plurality opinion in *Locket v. Ohio* did not forbid a state from enacting a felony murder statute, nor from making aiders and abettors equally responsible with principles.

Petitioner also attacked the imposition of the death penalty urging that varying aggravating factors had been improperly applied to this case, and that other mitigating circumstances had not been considered. The trial court found that all eight aggravating circumstances listed in Florida Statute, Section 921.141(5)(a)-(h), (1977), fairly applied. The trial judge further found that none of the mitigating circumstances listed in Section 921.141(6)(a)-(g) applied, and concluded that no mitigating circumstances existed which could outweigh the aggravating circumstances. First, Petitioner argued that he was not "under sentence of imprisonment" at the time the capital felonies were committed within the meaning of Section 921.141(5)(a) because the crimes were not committed while he was incarcerated or after he had escaped from incarceration. In fact, White was on parole at the time these crimes were committed and the Supreme Court found that the trial judge had properly applied this aggravating circumstance. Second, the trial judge had found, and in the view of the Supreme Court of Florida properly, that the Petitioner had been previously convicted of a felony involving the use or threat of violence to person, Section 921.141(5)(b), (assault with intent to commit rape). Third, Petitioner asserted that the trial judge had improperly considered that the defendant knowingly created a great risk of death to many persons under 921.141(5)(c). In this connection the trial judge had observed: "What would have happened had additional neighbors, delivery people or other friends appeared at the home for a visit can only be the subject of conjecture. Suffice it to say, that a total of six people were killed and two seriously wounded during the perpetration of this robbery." (T.R. 187–88). The Supreme Court of Florida concluded

that the trial court had erred in considering this aggravating circumstance basically because a person may not be condemned to die for what might have occurred. Fourth, the trial judge found, and the appellate court sustained the finding of a statutory aggravating circumstance that the capital felony was committed during the commission of another serious felony listed in Section 921.141(5)(d), in this case robbery. The Supreme Court did hold, however, that that same circumstance could not also constitute the basis for finding the existence of the aggravating circumstance listed in Section 921.141(5)(f), i.e., a capital felony committed for pecuniary gain as the trial judge had improperly done.

Petitioner further argued on appeal that the trial judge had improperly applied Section 921.141(5)(e) (capital felony committed to avoid or prevent a lawful arrest or effect an escape from custody) to him because he could not have attempted to avoid arrest when he was unaware that his cohorts had originally planned to kill the victims. The Supreme Court sustained the trial judge's findings that these capital felonies were committed in an effort to avoid arrest by eliminating witnesses to the crime, but again disapproved of the fact that the trial judge had used these same incidents as a basis for also finding that capital felonies were committed for the purpose of hindering the lawful exercise of enforcement of the criminal laws, Section 921.141(5)(g), criticizing the process of "doubling up of aggravating circumstances," and therefore struck this aggravating factor. 403 So.2d at 338. The Supreme Court of Florida did conclude that there was sufficient evidence to sustain the trial judge's findings that the capital felonies were committed in an effort to avoid arrest by eliminating witnesses to the crime.

Finally, the Petitioner claimed on appeal that the capital felonies were "not especially heinous, atrocious or cruel." The Supreme Court rejected this contention noting that the victims were "required to submit to a protracted ordeal during which time they undoubtedly agonized over the prospect of being murdered." *Id.* With regard to this aggravating circumstance, the Supreme Court of Florida quoted at length from the trial court's written findings:

Miss. [sic] Wooden was the first of the victims to be tied, gagged and blindfolded and she, for many hours was subjected to the taunts of the conspir[a]tors. During this ordeal she had to remain across the bed, laid on the floor or led around the house so constrained. She was terrified that any moment her baby might have been brought home and her boyfriend might return from work. She was required to listen while Mr. Stocker and his five friends were confronted, tied, gagged and blindfolded. She eventually faced the frustration of hearing her boyfriend arrive home and knew he was being tied and gagged.

Ultimately, all eight victims were in one bedroom during which time this defendant continued to guard them and discuss with other co-conspirators the searching of the house and captives, and the ultimate disposition of the bodies. The survivors testified as to their increased fright and anxiety when Miss. [sic] Wooden and her boyfriend were placed in one room and Mr. Stocker and his five friends remained in Stocker's bedroom. Cold-bloodedly, all eight victims were shot, six of whom received fatal wounds. Victim Stocker was heard to have cried to God for his assistance in stopping what he anticipated was going to take place. His prayers were interrupted by a shotgun blast to the back of his head. While each of the six men in Stocker's room were being shot, Miss. [sic] Wooden and her boyfriend were also being shot by another of the co-conspirators in another room. Each of the victims was dispatched by a shot from either a shotgun or a pistol which was deliberately and callously discharged into the back of his head. Miraculously, one victim in each of the two groups survived to testify as to the ordeal. While these executions were carried out by individuals other than the instant defendant he

nevertheless, was present and did nothing whatsoever to stop the assaults, harassments and shootings.

403 So.2d at 338–339.

The Supreme Court of Florida found that these brutal murders, including the calculated slaughter of six individuals and the attempted murder of two others, constituted an atrocity which set the capital felonies apart from the "norm" of capital felonies and thus was properly an aggravating circumstance. *Id.* at 339.

The Petitioner also argued on appeal that the trial judge had overlooked the mitigating circumstance that the defendant was an accomplice in the capital felony committed by another person, that his participation was relatively minor and that he had acted under extreme duress or under the substantial domination of another person, Sections 921.141(6)(d) and (e). The Supreme Court of Florida rejected both contentions finding "absolutely no evidence" to support "the assertion that the defendant acted under the coercion or the domination of another." *Id.* The Supreme Court of Florida went on: "We also do not find that the defendant played a minor role as an accomplice. He fully participated in the subduing and intimidation of the victims, in ransacking the house looking for valuables, and stood by while the victims were shot one by one. It was his motel room which was used as a place to plan the crimes and to divide the loot after the crimes were completed. The trial judge properly rejected the applicability of these two mitigating circumstances." *Id.* at 339. The Supreme Court of Florida concluded that although the trial court had improperly considered three aggravating circumstances, five had been properly found, and there were no mitigating circumstances, thus, a new sentencing trial was not mandated.

Petitioner also attacked the fact that the trial judge had imposed the death sentence after a unanimous jury recommendation of life imprisonment. The trial judge noted, as a result of the pre-sentence investigation and information presented at the sentencing, that he was aware of a number of factors which the jury did not have and thus could not have considered. Included among them were the defendant's prior conviction of a violent felony (attempted rape) and that he was still on parole when these offenses were committed. The trial judge also found that defense counsel's "vivid description to the jury on the effects of being electrocuted" were calculated to influence a life sentence through an emotional appeal. The trial court concluded that the death sentence was appropriate in view of the aggravating circumstances which far outweighed any possible mitigation. The Supreme Court of Florida agreed that the death sentence was well warranted, observing that while the advisory recommendation of the jury was to be accorded great weight, the ultimate decision rested with the trial judge. The Court noted that the "only colorable mitigating circumstance was the non-statutory consideration that the defendant was not the triggerman." *Id.* at 340. But it did not believe that that factor alone outweighed the enormity of the aggravating factors, including the defendant's full cooperation in the robberies and "complete acquiescence in the cold-blooded, systematic murder or attempted murder of eight individuals." The Supreme Court of the United States denied a petition for writ of *certiorari* on July 6, 1983, with Justices Brennan and Marshall dissenting. *White v. Florida,* 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983).

## C. *The Collateral Attack*

On January 19, 1984, Governor Robert Graham of Florida signed a death warrant ordering the defendant's execution then scheduled for February 7, 1984. Soon thereafter, on January 23, 1984, Petitioner filed a motion based upon the newly decided opinion of the Supreme Court in *Enmund v. Florida, supra,* pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure, seeking to set aside the death sentence. The petition for post-conviction relief was granted by a new trial judge, the Honorable Herbert M. Klein, who, after

hearing oral argument but taking no evidence, vacated the sentence of death. The trial judge specifically found upon its review of the record that "the defendant did not 'kill, attempt to kill, or intend that a killing take place,' and was therefore entitled to the protections afforded by the *Enmund* case." (T.R. 159).

The State appealed this order to the Supreme Court of Florida. After briefing and argument that Court, with two Justices dissenting, reversed the trial judge's Order, and reimposed the death sentence, finding three salient distinctions between *Enmund* and this case:

First, Enmund was not present at the robbery/murder premises whereas appellee was present before, during, and after the robbery and murders. Second, Enmund had no active role in the actual robbery and murders whereas appellee was armed and participated fully in capturing, intimidating, and guarding the robbery/murder victims. Third, Enmund did not intend or contemplate that lethal force would be used in carrying out the robbery. While appellee verbally opposed the killing during the discussion preceding the murders, he did nothing to disassociate himself from either the murders or the robbery. After the discussion relative to killing the victims, whatever appellee might have originally intended or contemplated about lethal force being used in the robbery, it can hardly be said that he did not realize that lethal force was going to be used in carrying out the robbery. On this point we refer to our rejection on direct appeal of appellee's argument in mitigation that his participation was relatively minor and that he acted under extreme duress or substantial domination of another: "We find absolutely no evidence to support the assertion that defendant acted under coercion or the domination of another. We also do not find that the defendant played a minor role as an accomplice. He fully participated in the subduing and intimidation of the victims, in ransacking the house looking for valuables and stood by while the victims were shot one-by-one. It was his motel room which was used as a place to plan the crimes and to divide the loot after the crimes were completed. *White v. State,* 403 So.2d at 339."

*State v. White,* 470 So.2d 1377, 1380 (Fla. 1985).

The Supreme Court of Florida concluded that *"Enmund* does not bar the imposition of the death penalty under these facts and circumstances." *State v. White,* 470 So.2d at 1380. Rehearing was denied on July 11, 1985. On August 22, 1985, Governor Graham signed a second death warrant and set the defendant's execution for September 30, 1985. On August 30, 1985, Petitioner filed this habeas corpus action. Oral argument was held by this Court on September 3, 1985 and again at length on September 13, 1985. During the September 13th argument, this Court directed Respondent to review the records of Petitioner's trial and sentencing procedure to insure that certain exhibits, various diagrams of the victims' home, were made part of this record. On September 20, 1985, counsel for Respondent notified the Court that he had located the original exhibits and the original diagrams of the crime scene were introduced as part of this record. On September 23, 1985, this Court granted Petitioner's Motion for a Stay of Execution of Sentence, finding that a stay of execution was necessary to permit a fair and thorough consideration of the merits of this petition prior to execution of the death sentence.

## II.

Petitioner has conceded for the purposes of this application that he was properly convicted of felony murder, but maintains that the death sentences were unconstitutionally imposed because he neither killed, attempted to kill, nor intended to kill in the instant case. His challenge is a serious and substantial one. We believe however that Petitioner has fundamentally misapprehended the *Enmund* findings of the Florida Supreme Court and the application of Eighth Amendment principles to the facts of this case.

The holding of *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) is clear. The Supreme Court ruled that the Eighth Amendment forbade the imposition of the death sentence upon: "one ... who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place, or that lethal force will be employed." *Id.* at 797, 102 S.Ct. at 3376. The facts of *Enmund,* of course, differ in material measure from those found here. In *Enmund,* two elderly individuals were robbed and fatally shot at their farmhouse in central Florida. Two of Enmund's co-defendants, Sampson and Armstrong, went to the back door of the victims' house asking for water for an overheated car. One of the victims, Mr. Kersey, came out of the house and was grabbed by an assailant who pointed a gun at him. He apparently cried out for help. His wife came out of the house with a gun, and shot and wounded one of the assailants. At that point, one or two of the co-defendants shot and killed both Kerseys, dragged them into the kitchen and fled with their money. Earl Enmund's participation in the crimes included the fact that he was the person in the car by the side of the road near the scene of the crimes, perhaps a few hundred feet away from the house, waiting to help the robbers escape after the execution of the crime. That was enough under Florida law to make Enmund one upon whom the death penalty could be imposed, even though he neither killed, was not present at the killing and there was no evidence to find that he intended that the Kerseys be killed, nor that he anticipated the use of lethal force.

Upon those facts the Supreme Court concluded that the imposition of the death penalty would be inconsistent with the Eighth and Fourteenth Amendments. Justice White, writing for the majority, observed that the focal point of Eighth Amendment death penalty analysis must be the personal culpability of each defendant, not his co-conspirator, for the Court has insisted on "individualized consideration as a Constitutional requirement," 458 U.S. at 798, 102 S.Ct. at 3377; *see also Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978), what had previously been called "the relevant facets of the character and record of the individual offender." *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976).

The Supreme Court found that Enmund self-evidently did not kill or attempt to kill and, as construed by the Florida Supreme Court, the record did not warrant "a finding that Enmund had any intention of participating in or facilitating a murder." *Enmund v. Florida, supra* 458 U.S. at 798, 102 S.Ct. at 3377.

Justice White noted that causing harm intentionally must be punished more severely than causing the same harm unintentionally because the death penalty was required to serve two principle social purposes—retribution and the deterrence of capital crimes by others. And the imposition of the death penalty would not measurably deter an individual who neither kills, nor has an intention or purpose that life will be taken. Rather, capital punishment would only serve as a deterrent when murder was the result of premeditation and deliberation. In short, the imposition of the death penalty for a vicarious felony murder would not deter the cold calculation that may precede the act of killing by another person. However, the Court noted: "It would be very different if the likelihood of a killing in the course of a robbery was so substantial that one should share the blame for the killing if he somehow participated in the felony." *Id.* at 799, 102 S.Ct. at 3377. But Justice White, citing empirical evidence, found that there was no basis to support the proposition that death occurs so often in the course of a felony for which killing is not an essential ingredient that the death penalty could be termed an effective and justifiable deterrent to the felony itself. That conclusion was based upon studies which compared the total number of robberies with the small percentage of homicides resulting from those robberies.

With regard to the calculus of retribution, the Court stressed that a defendant's intention, "and therefore his moral guilt," was critical to a determination of his culpability. *Id.* at 800, 102 S.Ct. at 3378. These criminal penalties were unconstitutionally excessive in the absence of intentional wrongdoing. The Court ultimately concluded that Enmund's criminal culpability under the facts of that case had to be limited to his participation in the robbery and thus that his punishment had to be tailored to "his personal responsibility and moral guilt." *Id.* at 801, 102 S.Ct. at 3378. To put Enmund to death to avenge two killings that he neither committed nor intended to commit nor caused in any real sense nor measurably contributed to would not serve the end of "insuring that a criminal gets his just desserts." *Id.*

In the instant case Petitioner has argued that three critical facts were found by the state trial judges and affirmed in two decisions by the Supreme Court of Florida: first that the Petitioner neither killed, attempted to kill nor intended that a killing take place; second, that the discussion of murdering the victims was initiated when one of the robber's masks fell off; and finally that the Petitioner objected to the killings when that discussion took place. The Petitioner also has contended that he was unaware that a contract killing had been discussed by two of his accomplices in advance of entering the victims' house; that he simply thought the assailants were there to consummate a robbery; that he had been pretty shaken up by the murders, and looked like a ghost; that subsequent to the murders Adolphus Archie learned for the first time that Francois and Ferguson had intended to kill someone on the night in question, and in fact, had been hired for that purpose; and finally that the Petitioner refused to personally dispose of the murder weapons.

Petitioner also relies upon the finding of the second trial judge on collateral review, and bolsters that with the reasoning of Justice McDonald who dissented from the State Supreme Court's holding in *State v. White.* Justice McDonald argued that *En-*

*mund* proscribed the imposition of the death sentence because Petitioner objected to the idea of the killings, did not take part in the killings, and refused to assist in the disposition of the weapons: "His role in guarding the door was to further a robbery, not a homicide. He did not kill, attempt to kill or intend to kill. The record does not disclose that he contemplated that lethal force would be used although he did know that all participants were armed. His failure to dissuade others from killing does not rise to a participation in the killing." *State v. White, supra,* at 1380 (McDonald, J. dissenting).

We think that Petitioner has fundamentally misapprehended the *Enmund* finding made by the Florida Supreme Court in *State v. White,* 470 So.2d at 1379–80. We believe that the Florida Supreme Court has made a particularized and individualized analysis of the culpability of the Petitioner, Beauford White, and found sufficient factual basis to support the imposition of the death penalty.

The Florida Supreme Court has really made two critical findings from which the ultimate finding of intent or contemplation emerges: first, that Petitioner did come to realize lethal force would be used in carrying out the robbery, and that this occurred, at the latest, when the mask fell off the face of one of his accomplices; and second, that there was no evidence to support the assertion that Petitioner acted under the coercion or domination of another. Put differently, the Supreme Court of Florida found that Beauford White came to know, realize or contemplate that lethal force would be used and freely chose to stay and participate, guarding the front door of a small cinderblock house as eight people were systematically shot in the back of the head, six fatally, and thereafter fled the scene of the crime with the two shooters, all of whom returned to his motel room where all of the loot generated from the robbery/murders was divided up. Putting together these two critical findings of fact—knowledge that deadly force would be used, and his voluntary participation

throughout—we read the Florida Supreme Court opinion to amount to a finding of the requisite criminal intent or *mens rea*. Indeed, we think the Supreme Court of Florida's opinion can only be read as a finding that the Petitioner Beauford White's participation in the events preceding, during and following the murders was voluntary and that he possessed the necessary intent even though he voiced opposition at one point to the murders.

In our view only two questions have to be answered by this reviewing court. First, did the Florida Supreme Court make an *Enmund* finding of the requisite criminal intent; and second, does the record fairly support that finding. We think the answer to both questions is yes. We stress that this Court's habeas corpus reviewing authority is properly limited by the standards enunciated by Congress in 28 U.S.C. Section 2254(d), and by the interpretations placed upon that statute by the Supreme Court of the United States in *Sumner v. Mata, infra,* and recently in *Cabana v. Bullock,* 484 U.S. ——, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986).

The Supreme Court in *Cabana v. Bullock,* 484 U.S. ——, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986) faced the question who must decide whether a non-shooter defendant possessed the requisite legal and moral culpability under *Enmund* —the trier of fact, the appellate court, or the habeas corpus reviewing court. The case arose on appeal from the Fifth Circuit which had reversed a district court's denial of a writ of habeas corpus on the ground that Bullock's death sentence was invalid under *Enmund.* The Fifth Circuit reached its conclusion based upon a review of the jury instructions, reasoning that the jury could have found guilt for capital murder solely on the basis of participation in a robbery in which defendant served as an aider and

abettor to someone else who killed. The instructions did not require any finding of intent to kill on Bullock's part nor a requirement that Bullock had actually killed or attempted to kill.[2] The Supreme Court reversed the Fifth Circuit and in the process expounded the appropriate standard of review to be applied by a federal habeas corpus court examining an *Enmund* claim. Justice White, again writing for the Court noted: "[T]he [reviewing] Court must examine the entire course of the state-court proceedings against the defendant in order to determine whether, at some point in the process, the requisite facts or findings as to the defendant's culpability has been made. If it has, the finding must be presumed correct by virtue of 28 U.S.C. Section 2254(d), *see Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), and unless the habeas petitioner can bear the heavy burden of overcoming the presumption, the Court is obliged to hold that the Eighth Amendment as interpreted in *Enmund* is not offended by the death sentence." *Id.* 106 S.Ct. at at 697–98. The Supreme Court ruled that the Fifth Circuit had erred in focusing exclusively on the jury instructions and in ordering a new sentencing hearing without inquiring whether the necessary finding of intent had actually been made by the trial court or by the state appellate court.

*Sumner v. Mata, supra,* had already established that the presumptive validity of the state fact-finding process is equally applicable to facts found by appellate as well as trial courts. In that case the Supreme Court reversed the Ninth Circuit Court of Appeals which had granted a writ of habeas corpus on the basis of a pre-trial identification issue. The Ninth Circuit had failed specifically to refer to the standards laid out in 28 U.S.C. Section 2254(d).[3]

---

**2.** The Fifth Circuit's approach in *Bullock* conflicted with the interpretation of *Enmund* adopted by this Circuit in *Ross v. Kemp,* 756 F.2d 1483 (11th Cir.1985), where the United States Court of Appeals ruled that where a jury may not have found that the defendant possessed the requisite culpability required by the Eighth Amendment, a federal habeas corpus

court could conduct an independent *de novo* review of the record in order to make that determination.

**3.** Because the standard of review in the instant case is so important to the ultimate determination on the merits, we lay out those limiting clauses. Section 2254(d) provides:

*Sumner v. Mata, supra,* explained in detail the appropriate standard to be applied by a federal habeas corpus court in reviewing a challenge under 28 U.S.C. Section 2254, and *Cabana v. Bullock* has now made clear that that standard is equally applicable to an *Enmund* review. The *Sumner* Court noted that a federal judge may overturn the judgment of the highest court of a state insofar as it deals with the application of the Constitution to the facts of a particular case. 28 U.S.C. Section 2254(d), however, imposes specific limitations on the statutory authority of the federal habeas reviewing court.

Justice Rehnquist, writing for the *Sumner* Court, observed that when Congress enacted 28 U.S.C. Section 2254(d) it recognized an interest in federalism and required "deference by federal courts to factual. determinations of all state courts." The Court underscored that this would be particularly true in a case where, as here, "a federal court makes its determination based on the identical record that was considered by the state appellate court...." 449 U.S. at 547, 101 S.Ct. at 769. The

Supreme Court concluded that in adopting the 1966 Amendment to the Habeas Corpus Act "Congress ... intended not only to minimize that. inevitable friction but also to establish that the findings made by the state-court system 'shall be presumed to be correct' unless one of seven conditions specifically set forth in 2254(d) were found to exist by the federal habeas corpus court. If none of those seven conditions were found to exist or unless the *habeas* court concludes that the relevant state-court determination is not 'fairly supported by the record,' 'the burden shall rest upon the applicant to establish by *convincing evidence* that the factual determination by the state court was erroneous.' " (emphasis in original). 449 U.S. at 550, 101 S.Ct. at 770.

Thus it is clear that in the absence of one of the enumerated factors in Section 2254(d), the burden rests upon the habeas corpus petitioner whose case has already run the gamut of the state system to establish by "convincing evidence that the factual determination of the state court was erroneous." Congress explicitly intended

.(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing of the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

1. that the merits of the factual dispute were not resolved in the state court hearing;

2. that the factfinding procedure employed by the state court was not adequate to afford a full and fair hearing;

3. that the material facts were not adequately developed at the state court hearing;

4. that the State court lacked jurisdiction of the subject matter or over the applicant in the state court proceedings;

5. that the applicant was an indigent in the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the state court proceedings;

6. that the applicant did not receive a full, fair, and adequate hearing in the state court proceeding; or

7. that the applicant was otherwise denied due process of law in the State court proceeding; or

8. or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the state court was erroneous.

and meant to insure that a state finding not be overturned "merely on the basis of the usual 'preponderance of the evidence' standard in such a situation." *Id.* at 551, 101 S.Ct. at 771. In sum, the *Enmund* question is a fact question and not a mixed determination of law and fact, and when a state court makes that finding it is entitled to a presumption of correctness.[4]

On this record, the Supreme Court of Florida could fairly find that Petitioner contemplated deadly force would be used to effect the robbery. Part of the evidence included a post-arrest confession made by Petitioner Beauford White to Detective Robert Derringer. Derringer testified specifically that White had told him that he and the wheelman, Adolphus Archie, were asked by co-conspirator Ferguson if they would go with Ferguson "to take off a dope house or something to that effect" or as he put it later "to rob a dope house." (T.R. at 842). At the outset, then, Petitioner knew, at a bare minimum, that the specific object of the robbery was a narcotics house. He started with ample reason to anticipate that deadly force would be used. That lethal force would be contemplated in the context of such an enterprise seems to be an eminently reasonable conclusion to draw from the nature of any robbery directed specifically at an illicit drug house. The federal courts have for years recognized the inextricable link between guns, use of the tools of violence and the drug trade. Whether for their own protection, for the protection of their property or for their use in stealing from others, individuals engaged in buying or selling narcotics are reasonably assumed to be armed. *See e.g., United States v. Perez,* 648 F.2d 219, 224 (5th Cir.), *reh. denied,* 655 F.2d 235 (5th Cir.), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981); *United States v. Pentado,* 463 F.2d 355, 360 (5th Cir.), *cert. denied,* 409 U.S. 1079, 93 S.Ct. 698, 34 L.Ed. 668 (1972). As the United States Court of Appeals for the Second Circuit noted in *United States v. Wiener,* 534 F.2d 15, 18 (2nd Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976): "Experience on the trial and appellate benches has taught that substantial dealers in narcotics keep firearms on their premises as tools of the trade almost to the same extent as they keep scales, glassine bags, cutting equipment and other narcotics equipment." In short, given the large sums of money and quantities of narcotics involved, and the high risk of loss at the point of exchange, it is often reasonable to infer that those present at such an exchange, especially an exchange which might involve the armed robbery of a narcotics dealer, will have occasion to use deadly force. Sadly in South Florida the use of lethal force in the context of a narcotics transaction has been repeatedly and amply demonstrated. *See e.g., United States v. Alvarez,* 755 F.2d 830, 848–49 (11th Cir.1985), *cert. denied, Hernandez v. United States,* —— U.S. ——, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985); *Royer v. State,* 389 So.2d 1007 at 1023–1024 (3rd DCA 1980) *(en banc )* (Hubbart J. concurring), ("unprecedented degree of violence and murder"); *affirmed Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *State v. Sayers,* 459 So.2d 352, 353 (3rd DCA 1984), *reh. denied,* 471 So.2d 44; *Martinez v. State,* 413 So.2d 429, 430 (3rd DCA 1982).

In sum, there is ample reason indeed to conclude that the foreseeability of lethal force arising out of an armed invasion of a narcotics house was so great as to amount to a near certainty in light of the armed resistance likely to be offered by the victims. And thus the "hitting of a dope house" is sharply distinguishable from the ordinary armed robbery, the kind of armed robbery which occurred in *Enmund,* where the likelihood of the use of lethal force is small. However, it is entirely unnecessary to base the imposition of the death sen-

---

**4.** The issue of criminal intent has long been considered a fact question to be resolved on the basis of all the evidence. *United States v. Henry,* 749 F.2d 203, 213 (5th Cir.1984); *United States v. Zimeri-Safie,* 585 F.2d 1318, 1321 (5th Cir.1978); *United States v. Greenfield,* 554 F.2d 179 (5th Cir.1977), *cert. denied,* 439 U.S. 860, 99 S.Ct. 178, 58 L.Ed.2d 168 (1978).

tence here solely upon the powerful inference arising from Petitioner's agreement "to take off a dope house" or "to rob a dope house," because there is specific and concrete evidence of Petitioner's knowledge that lethal force in this particular transaction would be used, and used on a barbaric scale.

We note that it was Petitioner White who urged Adolphus Archie, the wheelman, to join them in the enterprise noting: "You might as well, man. You keep complaining about your bills." (T.R. at 1110). Moreover, the record evidence shows that the conspirators met in Petitioner's motel room in advance to plan the robbery and that during the course of the meeting, Petitioner not only saw a sawed off shotgun and two hand guns, but was given one of the hand guns, a loaded .22, which he carried himself. Indeed, the record evidence suggests that Petitioner White knew how many shotgun shells Francois had. (T.R. at 949).

The wheelman Archie testified at trial that he was told by Francois after the murder that Beauford White was asked to join the undertaking because they knew that somebody else would probably come home with Stocker, and they needed a third gun. As Archie put it, Francois said that he and Ferguson were hired "[t]o kill—he said they were only supposed to kill two people." Francois didn't tell Archie their names. According to Archie, Francois confided "that's why they had to use Beauford ... [b]ecause they figured someone else was going to come home with them, whoever they was going to [sic]." (T.R. at 1137). They chose White, in short, because they needed a third armed assailant to assist them if Stocker, the object of a contract murder, brought others home.[5] Thus,

White knew on the front end of the transaction whom he went with and that the object was to rob a dope house, and chose to participate armed with a shotgun and pistols.

The record further supports a finding that White came to realize fully that lethal force would be used. The transaction itself lasted a substantial period of time, indeed, a number of hours and the contemplation of deadly force undoubtedly intensified with each passing hour. The evidence is that Beauford White remained throughout, was armed throughout and directly and personally participated in subjugating eight individuals as they entered, were bound and gagged, forced to lie face down on the floor of various rooms in the small cinderblock house, and threatened with death. At one time during the course of this brutal armed seizure of the house and the subjugation of its occupants, a shotgun was placed to the head of one of occupants, Margaret Wooden, who testified that one of the co-defendants, not White, pointed the gun at her head and said: "We have to start with this little girl and then kill all of you." (T.R. at 727). Stocker, the object of the robbery/murder indicated that if he had anything, he would give it to them. Miss Wooden testified further that she heard another victim say, "if we had anything else, we will give it to you" and a defendant say "[s]orry, but its got to be this way." (T.R. at 730). The only other survivor to the massacre was one Johnny Hall, who testified that at another time Francois loaded the shotgun, and pointed it at Stocker. Johnny Hall heard Francois say "Shut up, nigger" as he shot Stocker in the back of the head, in response to Stocker's plea for mercy. (T.R. at 782).

5. The following questions were also put to Archie at trial (T.R. at 1138): "Question: Did that mean they needed more than two people to handle the job they were going to do? Answer: Evidently." Then Archie said at a later point: "Marvin said, 'That's why we had to use Beauford, because we figure somebody else would come home with him.'" "Question: The person they were after? Answer: Yes. Question: They needed you for what purpose? Answer: To drive them over to get out there. Question: Are you the only one with a car? Answer: Yes. Question: So you were supposed to be the driver and it was supposed to be Francois and Ferguson but they needed a third person, Beauford White, in the event the person they were after came home with more people than they expected. Is that correct? Answer: Yes." (T.R. 1138–39).

The confession of Beauford White is also instructive about what he knew and when he came to know it. White's confession to Derringer included the assertion that somewhere during the course of this transaction, after Ferguson came back from searching the car of one of the victims, White suggested they leave because they had found nothing. Petitioner indicated that his co-defendants talked and that thereafter: "I got afraid at the time, and I moved toward the front door. And so Ferguson went and got the girl and her boyfriend, and took her to their room, and Marvin got the shotgun and the shells and went to Stocker's room." They did not tell White what they had been talking about. "I never did know. *In a way, I was afraid to ask.*" Petitioner took the 21 inch TV to the front door and heard the shotgun. He continued: "Then I heard two shots in the bedroom where the girl and her boyfriend was. Then I heard the shotgun again. Then I heard the shotgun again. Then I heard the—another shot in the girl's bedroom. Then the shotgun came off again. And by the time Ferguson came out of the room, I kind of opened the door, kind of opened the front door, and then Marvin ran out and let Ferguson and got the .38 from him and went back into the room; and I think he fired two or three shots." Once the shots were fired, "after everything had fired, I left out the door. Then Marvin came and then Ferguson came." (T.R. at 941–944) (emphasis added). Even his own confession, which interestingly enough makes no reference to expressing verbal opposition to the shootings, alludes to a strong suspicion that lethal force on a barbaric scale would be used. In sum, we think this record supports the Florida Court's finding that whatever Petitioner may have known at the outset, during the course of this two hour plus carnage he surely came to realize that lethal force would be used.

The second fact found by the Florida Supreme Court on the *Enmund* issue, and in our view an equally critical one, is that there was no evidence to support the assertions that Petitioner acted under the coercion or domination of another, or that his participation was in any sense minor. Like the trial judge, the Supreme Court found no evidence of duress but rather that he freely chose to remain and participate actively throughout.

Petitioner's argument on this point amounts to an elaborate post-hoc effort to surgically remove himself from the murders, notwithstanding his knowledge and participation. He has asserted that all he did was facilitate robbery, not murder. On this fact pattern, the Florida courts could reasonably find, as we think they did, that his participation amounted to more than participation in a robbery. The long and the short of this case is that he contemplated the use of lethal force and acted voluntarily. There was no evidence that he was forced to act, or that anything he did was the product of coercion or threat. He was not compelled to carry a loaded weapon. He was not forced to stay in that house for two and one-half hours. He was not forced to meet with the co-defendants before and after the crime in his motel room, or to take his share of the loot. His participation in the crimes was active and his acquiescence in the total result was complete. He facilitated not simply robbery but also murder by tying up the victims, by intimidating them, by wiping the house of fingerprints and by giving his weapon to the other co-defendants who then dropped them in the river.[6] He facilitated the robbery/murders by helping to guard the scene of crime as each group of

6. Petitioner makes much of the fact that he did not personally dispose of the weapon when asked to do so by his co-conspirators, but instead delegated the task to them. We think Petitioner's method of divesting himself of the weapon is susceptible to various interpretations. Petitioner claims that the matter of weapon disposal reflects his underlying distate for the entire operation, thus further negating any manifestation of the requisite intent. However Petitioner may not reduce his culpability for the murders simply because he didn't throw the weapons in the river. Indeed Petitioner's reliance upon his cohorts to accomplish this task may be viewed simply as confirmation of his desire to elude detection.

victims walked into the house and by guarding the front door as the murders were executed. At no point did he attempt to stop the shooting, or to leave before the shootings were complete, or to assist the police afterwards in unravelling the crime, or to disassociate himself in any way by any act from the bloodbath that ensued. Unlike *Enmund,* this Petitioner's personal responsibility, his individual and particularized moral guilt are evident. While he didn't pull the trigger, we think the State Court could find that he knew enough and did enough to impose the death sentence without violating the command of *Enmund.*[7]

Most of the other reported post-*Enmund,* non-triggerman death cases raise the same basic problem for a reviewing court—how to sort out or surgically excise the underlying felony from the ensuing homicide. Some reviewing courts have come to the same conclusion reached in *State v. White, supra.* While none involve

the expression of verbal opposition to the idea of killing by the non-triggerman we think nevertheless that the cases are instructive here. Thus, for example, respondent has cited *State v. Tison,* 142 Ariz. 454, 690 P.2d 755 (1984), *cert. granted,* —— U.S. ——, 106 S.Ct. 1182, 89 L.Ed.2d 299 (1986), where the Supreme Court of Arizona made a post-*Enmund* analysis and found the evidence sufficient to show that the defendant possessed the requisite intent, thereby supporting the imposition of the death penalty even though he was a non-shooter. The defendant in that case, Raymond Tison, was convicted of four counts of first degree murder, as well as two counts of robbery, three counts of kidnapping and one of theft of a motor vehicle. The facts were not in dispute. He and his two brothers assisted the escape of their father, one Gary Tison, and a Randy Greenawalt from the Arizona State Prison. The five men fled the prison in a car. Later they transferred to a second car which in turn became disabled with a flat tire. Four vic-

---

**7.** We note in passing that an analysis of the facts of this case using the standards enunciated by the ALI Model Penal Code also supports the particularized *Enmund* finding of the Florida Supreme Court. We observe that the ALI Model Penal Code has been cited by the Supreme Court both in *Enmund v. Florida* and by Mr. Justice White in his separate opinion in *Lockett v. Ohio, supra,* 438 U.S. 586 at 627–28, 98 S.Ct. 2954, at 2984–85. Section 2.02 of the Model Penal Code undertook the extremely difficult task of articulating and discerning between different *mens rea* requirements for the establishment of liability. Section 2.02 had as its purpose to promote a clarity of definition of specific crimes and "to dispel the obscurity with which the culpability requirement is often treated when such comments as 'general criminal intent,' '*mens rea,*' 'presumed intent,' 'malice,' 'willfulness,' 'scienter,' and the like must be employed." *See,* Comments, Section 2.02 ALI Model Penal Code at 123. In defining the kinds of culpability under the model penal code, distinctions were drawn between acting purposely or knowingly on the one hand, and recklessly or negligently on the other. Section 2.02, Subsection 2(b)(ii) indicates that a person acts knowingly if "he is aware that it is practically certain that his conduct will cause such a result." Prior to the commission of the robberies and murders in the instant case Petitioner participated, as we've repeatedly noted, in the selection of a firearm with his co-defendants, revealing his anticipation that lethal force might be used. He

was told at the start that they would be hitting a dope house, thereby heightening his knowledge. He entered the target home after learning that the house had been occupied by Margaret Wooden. Moreover, the fact that three armed men were needed to carry out the robbery of a small cinderblock home initially apprised the Petitioner as well that force might be necessary to accomplish the robbery. That contemplation grew with each passing hour. Petitioner's continued armed presence, along with his co-defendants, awaiting more robbery victims doubtlessly alerted the Petitioner that the likelihood of the use of lethal force grew still further. Finally, at some point along the way, Petitioner had to be practically certain that his efforts in guarding and subduing the victims would facilitate the end result of their murders. He was present throughout a variety of threats, including the shotgun threat to the head of Margaret Wooden, and was present when the discussion of murdering all of the victims transpired when the mask fell off the face of one of the co-conspirators. While a narrow distinction is drawn by the Model Penal Code between acting purposely and acting knowingly, a central distinction exists between acting knowingly or purposely on the one hand and acting recklessly or negligently on the other. Analytically we think the Supreme Court of Florida could have found on the face of this fact pattern that Petitioner Beauford White acted knowingly as that term is defined and employed in the ALI Model Penal Code.

tims in a passing car stopped to render aid. The gang killed the four of them, took the car and were subsequently apprehended days later.

The facts of *State v. Tison* did not show however that the defendant killed or attempted to kill anyone. The court's finding of intent was rooted in a record which showed that the defendant played an active role in preparing the breakout, including obtaining a getaway car and various weapons. At the breakout scene, the defendant played a crucial role by, among other things, holding a gun on the prison guards. Moreover, the defendant knew that Gary Tison's murder conviction arose out of the killing of a guard during an earlier prison escape attempt. Thus, the Supreme Court of Arizona said that "petitioner could anticipate the use of lethal force during the attempt to flee confinement." 690 P.2d at 757. They noted that defendant admitted later he would have been willing to kill in a very close life or death situation and that he recognized after the escape that there was a possibility of killing. And they emphasized that the defendant assisted the abduction by flagging down the victims as they drove by while the other members of the gang remained hidden and armed. Moreover, he escorted the victims to the murder site. At that site the Defendant and Greenawalt placed the gang's possessions in the victims' Mazda and the victims' possessions in the gang's disabled car. He watched, however, from a distance, as Gary Tison and Greenawalt fired in the direction of the victims. He did nothing to interfere and after the killings he did noth-

ing to disassociate himself from either Tison or Greenawalt but rather used the victims' car to continue on a joint venture that lasted several more days.

Petitioner White's attempts to distinguish *Tison* from the instant case are largely unpersuasive. As in *Tison* and unlike *Enmund*, Petitioner was armed and present throughout; as in *Tison* and unlike *Enmund*, he participated in the activities leading directly up to the murders; and as in *Tison*, he continued on the venture after the murders had been effected by the actual shooters. In our view the evidence that Petitioner contemplated the use of lethal force is in some ways even more compelling here than in *Tison*. As we've noted, the only other real distinction between this case and *Tison*, and indeed between this case and virtually all of the other non-shooter cases which we have examined, is that Petitioner verbally objected to the use of lethal force.[8] In every other way, however, his participation before, during and after the murders was as active, direct and significant as the participation of Tison.

Still other post-*Enmund* cases in Florida have imposed the death penalty sentence upon a non-shooter and faced the same analytical problems. Thus, for example in *Cave v. Florida*, 476 So.2d 180 (Fla.1985), the defendant Cave was convicted of one count of first degree murder and robbery with a firearm and kidnapping. The relevant facts were that Cave and three accomplices drove to a convenience store late one night in Stuart, Florida. Cave and two of the men entered the store where Cave held a handgun on a youthful female clerk and

**8.** Although Petitioner has urged this Court to consider his verbal objection as conclusively disposing of his intent, this record will not support that conclusion. In *Andrews v. Shulsen*, 600 F.Supp. 408 (Utah 1984) a federal court rejected a similar argument from a habeas Petitioner. The *Andrews* Petitioner was sentenced to death for the murder and attempted murder of five victims during the robbery of a stereo shop. Petitioner and his co-defendant forced the victims into the basement of the store and bound their hands and feet. Petitioner poured liquid drain cleaner into a cup. The victims were forced to drink it and Petitioner's partner shot each victim. Because Petitioner twice told

his cohort, "I can't do it; I'm scared," Petitioner maintained that his protest belied the requisite intent for the death penalty. The habeas court found that Petitioner's actions in guarding the victims at gunpoint, in measuring out the doses of drain cleaner, and in taping the mouths of the victims refuted any moral qualms the Petitioner had expressed. 600 F.Supp. at 430. The Florida courts could fairly find here that a single statement of opposition to the shootings, made in the course of the two-plus hours during which the ordeal continued, was not enough to vitiate everything else that Petitioner said and did, nor could it obscure the knowledge which he possessed.

demanded the store's cash. The clerk surrendered the cash whereupon she was taken from the store and placed in the back seat of the car. The men drove her to a rural area approximately 13 miles away where she was removed from the car by all four men. After leaving the car, one of the men stabbed the victim and when she fell over another fired a single lethal shot into the back of her head. The men then departed the scene together but were stopped approximately an hour later on route back to Ft. Pierce, Florida, by police officers because of a defective tail light. Cave argued that application of the *Enmund* doctrine should preclude the imposition of the death sentence, contending that he neither killed, attempted to kill nor intended that a killing take place or that lethal force would be used.

The Supreme Court of Florida rejected that position and distinguished that case from *Enmund* much as it has this case. They said: "Appellant Cave was the gunman who admits to holding the gun on the clerk during the robbery and forcing her into the car; he was present in the car during the thirteen-mile ride and heard her plead for her life and he was present when she was forceably removed from the car in a rural area, stabbed and shot in the back of the head. Under these circumstances, it cannot reasonably be said that appellant did not contemplate the use of lethal force or participate in or facilitate the murder." 476 So.2d at 187. In support of that holding in *Cave*, the Supreme Court of Florida cited its opinions in *State v. White, supra,* and *White v. State, supra.* Again, in the *Cave* case, although there was no evidence that the defendant shot or attempted to shoot, the Court inferred the requisite intent from armed presence and participation throughout the transaction, and knowledge from the circumstances that the victim was driven in a car some 13 miles away and heard to plead for her life before being stabbed and then shot to death.

Still another post-*Enmund* non-shooter case upholding the imposition of the death penalty after an *Enmund* review is the Florida case of *Bush v. State,* 461 So.2d 936 (Fla.1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 1237, 89 L.Ed.2d 345 (1986). The defendant there, John Earl Bush, was convicted of first degree murder of one Frances Slater and sentenced to die. The evidence at trial indicated that Frances Slater was abducted from a convenience store where she worked and the store's cash register and floor safe were robbed. Later that day the victim's body was found 13 miles from the store with a stab wound in her abdomen and a fatal bullet wound to the back of her head fired at close range. Defendant Bush contended that he didn't realize his accomplices were planning to rob the convenience store and that during and after the robbery he was under their domination. After the robbery he conceded that they drove away. The victim was pushed out of the car but he claimed that he intended to set her free. The accomplices, he contended, decided that the victim might identify them and therefore they told Defendant Bush to dispose of her. Bush argued that he didn't want to kill her and so he faked a blow at her with his knife and stabbed her superficially. She fell to the ground and an accomplice, Parker, shot her.

The jury returned a verdict of guilty on the first degree murder charge, robbery with a firearm and kidnapping, and subsequent to the sentencing hearing, the jury recommended in a 7–5 advisory opinion that the death penalty be imposed. The trial judge citing three aggravating factors and no mitigating factors sentenced Bush to die. Bush argued that the death penalty collided with the dictates of *Enmund.* The Supreme Court of Florida distinguished Bush from *Enmund:* "Here we do not have a mere passive aider and abettor as in *Enmund,* where the only participation by Enmund was as driver of the getaway car from what he supposed was only a robbery and not a murder. The facts of this case show that Bush was a major, active participant in the convenience store robbery and his direct actions contributed to the death of the victim. The degree of Bush's participation is sufficient to support a finding

that his involvement constituted the intent or contemplation required by *Enmund*." *Id.* at 941.

Also cited by Respondent is the leading Eleventh Circuit case of *Ross v. Kemp*, 756 F.2d 1483 (11th Cir.1985) (*en banc*), where the United States Court of Appeals held that the death penalty could be imposed on a defendant who was actively engaged in furthering the course of events which led directly to a policeman's murder whether or not he actually pulled the trigger. Under the facts of that case, after a jury trial in Georgia, the defendant Ross was convicted of armed robbery, kidnapping and murder, sentenced to life in prison, 20 years, and the death penalty, respectively. The defendant contended that *Enmund* was violated because the jury did not make a specific finding that he either murdered or intended to murder the lieutenant and therefore that he was entitled to a new sentencing hearing. The Eleventh Circuit did not read *Enmund* to require that a jury expressly make such a culpability determination, and the Court made that determination *de novo* finding that the death penalty was proportionate to defendant's conduct. The evidence adduced fully warranted the conclusion that appellant actually fired the shot that killed the lieutenant even though defendant had argued that a co-conspirator fired the fatal shot. The Court did observe, however, that even if it were to accept defendant's version that he did not fire the fatal shot (which was termed remote), his actions nevertheless were sufficient to warrant the imposition of the death sentence.

Judge Kravitch writing for the *en banc* court noted:

> We do not read *Enmund* as barring the death penalty for all non-triggermen, but merely as requiring a level of individual participation that justifies the application of the death penalty. The Supreme Court's objection in *Enmund* that Earl Enmund was to be executed "regardless of whether [he] intended or contemplated that life would be taken," *id.* [102 S.Ct.] at 3379, simply does not extend to appel-

lant whose actions undeniably reflect the contemplation that life would be taken. Appellant does not deny that he and Turner held the Stanford family hostage while their cohorts went to the Lee home. Likewise, it is undisputed that appellant was armed and in the dining room with Turner when Lieutenant Meredith entered the home. He was thus actively engaged in furthering the cause of events that led directly to Meredith's murder, whether or not he actually pulled the trigger. (citations omitted). 756 F.2d at 1489.

The Court repeated that the two primary purposes of capital punishment, deterrence and retribution, could legitimately be applied to the facts of that case. The Court observed that the "intentions, expectations and actions ... of an individual engaging in such acts rise to a level of culpability such that the retributive purposes of capital punishment are furthered by appellant's sentence of death." *Id.* The Court concluded: "... even if appellant's actions are viewed in their most favorable light, and even if we completely discount the testimony of those witnesses who stated that appellant had told them he thought he had shot a policeman, appellant's culpability still is of a magnitude wholly different from that of Earl Enmund ... the record here depicts an individual who undoubtedly contemplated that lethal force would be used either by himself or by others as they held a family hostage, and who actively participated in the activities that culminated in Lieutenant Meredith's death. Consequently, we find that the death penalty in this case does not violate the Eighth Amendment...." *Id.*

 What the instant case boils down to, and what these post-*Enmund* non-triggerman cases teach, is that armed presence and participation in the course of subjugation and robbery or kidnapping, coupled with knowledge that lethal force will be used, is enough to meet the requirements of *Enmund v. United States, supra*. We think on the facts of this case, the Florida Supreme Court could reach the conclusion

that it did—that Petitioner White fully realized lethal force would be used, and that he freely participated throughout—that he possessed the requisite *mens rea* to permit the state to sentence him to die. The State Court could find, as implicitly it did, that the purposes of both deterrence and retribution would be served by the imposition of this death sentence, that Petitioner shared the blame for these killings and thus that in the end his punishment had been tailored to "his personal responsibility and moral guilt."

### III.

█ Petitioner also contends that the reimposition of the death sentence by the Supreme Court of Florida after it was vacated on collateral attack by the trial court constitutes a violation of the double jeopardy clause of the Fifth Amendment.

Again the procedural history is not in dispute. On January 23, 1984, Beauford White filed motions in the trial court seeking post-conviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure, and a stay of his execution then scheduled for February 7, 1984. The trial judge, the Honorable Herbert M. Klein, who did not preside over the trial, heard oral argument on the post-conviction collateral attack on January 26, 1984 and rendered his opinion from the bench and again in writing on January 27, 1984. No new evidence was adduced at the hearing and argument was predicated upon the application of *Enmund* to the agreed upon facts. The trial court found that the *Enmund* petition was "well taken," that the Petitioner did not intend to kill and thus that the imposition of the death penalty was constitutionally impermissible. (T.R. at 67). The trial judge, while vacating the death sentence, did not resentence the defendant in order to avoid, in his view, any possibility that such a sentencing would preclude the state from appealing his ruling on what he termed "this very close question." (T.R. at 68).

On appeal to the Supreme Court of Florida, Petitioner argued that Judge Klein's order was the functional equivalent of an acquittal and that it would serve to bar appellate review under the double jeopardy clause. The State Court rejected that contention in these terms: "Appellee's argument ... is far reaching in its implications. Essentially, appellee argues that in a post-conviction proceeding a trial court decision that a sentence is constitutionally impermissible is not subject to review even though the state supreme court has previously held to the contrary and the United States Supreme Court has denied certiorari review. Appellee would have us establish trial courts as the supreme authority on constitutional law." 470 So.2d at 1378, n. 1.

Petitioner has argued that the finding of the trial judge that the evidence introduced by the state was insufficient on the element of intent necessary to impose death penalty constitutes an acquittal on that element. Petitioner asserts that once the state judge vacated the Petitioner's death sentence it could not constitutionally be reimposed by anyone at anytime. In support of that proposition Petitioner relies principally upon the Supreme Court's rulings in *Bullington v. Missouri, supra; Burkes v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); and *Arizona v. Rumsey*, 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984), and upon the ruling of the Eleventh Circuit in *Young v. Kemp*, 760 F.2d 1097, 1105–07 (11th Cir.), *reh. denied*, 765 F.2d 154 (11th Cir.1985).

We believe that Petitioner has misunderstood the nature and purpose of the double jeopardy clause of the Fifth Amendment to the United States Constitution and has misapprehended the application of the governing case law to the facts of this case. The holdings of *Bullington, Burkes, Young* and *Arizona v. Rumsey* are inapplicable. Petitioner has not been subjected to retrial or resentencing, nor has he been required to run the "gauntlet" twice. Instead, he has merely been unsuccessful in his attempts to reverse his sentence. We find that he has not experienced multiple prosecutions and sentences but rather one prose-

cution and one sentencing which he elected to appeal collaterally, and thus that the double jeopardy protections of the Fifth Amendment have not been implicated.

First, his reliance upon *Bullington v. Missouri, supra,* is misplaced. In *Bullington,* the High Court held that double jeopardy applied to the sentencing phase of Missouri's bifurcated death penalty system. The defendant had been convicted of capital murder and in a separate sentencing proceeding was sentenced to life imprisonment by the jury. Bullington's conviction was reversed on appeal on the ground that the trial jury was not drawn from a fair cross-section of the community, and the state determined prior to the second trial to seek the death penalty. The Supreme Court ruled that the state's effort to seek the death penalty a second time on a new trial violated double jeopardy. Central to the Court's decision was the nature of the bifurcated proceeding in which Bullington was sentenced. The Supreme Court found that the sentencing proceeding had all the earmarks of a trial on guilt or innocence and thus the government was bound to prove certain aggravating factors beyond a reasonable doubt before the jury could render a death sentence. The jury's discretion was limited to the choice of only two penalties—life in prison or death—and the Supreme Court determined that in sentencing Bullington to life in prison, the sentencing jury necessarily acquitted him of whatever may have been necessary to permit the imposition of the death sentence. In essence the jury had found that the evidence was insufficient to support the harsher sentence.

In *Burkes v. United States, supra,* the Supreme Court held that a defendant may not be retried if he obtains a reversal of his conviction on the grounds that the evidence was insufficient to convict. The Supreme Court noted that *Burkes* was foreshadowed by its holding in *Green v. United States,* 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957), where the defendant had been indicted for first degree murder and the trial court had instructed the jury that it could convict him either of that

crime or the lesser included offense of second degree murder. The jury convicted him of second degree murder and the conviction was subsequently reversed on appeal. The Court held that a retrial on the first degree murder charge was barred because the defendant "was forced to run the gauntlet once on that charge and the jury refused to convict him." *Id.* at 190, 78 S.Ct. at 225.

Nothing in *Bullington* or *Burkes* supports Petitioner's contention. The thrust of the Supreme Court's holding in both *Bullington* and *Burkes* was to proclaim that the state having received "one fair opportunity to offer whatever proof it could assemble" is not entitled to a second opportunity to do that. *See Bullington v. Missouri,* at 451 U.S. at 446, 101 S.Ct. at 1862; *Burkes v. United States,* 437 U.S. at 16, 98 S.Ct. at 2149. We underscore again that Petitioner has not been forced to run the gauntlet twice in this case, nor has the state been given two opportunities to adduce its proof before the trier of fact or the sentencing court. The initial trial judge in the instant case, Circuit Judge Fuller, did not sentence Petitioner to a term of life in prison only to see that conviction reversed and the state start over again and seek the death penalty at a second factual hearing. In this case the conviction was for first degree murder and the Petitioner was sentenced to die. The new trial judge simply vacated the death sentence based upon oral argument; no new fact hearing was held and no new evidence adduced. This case is not *Bullington* revisited.

Petitioner has also argued at length that the case of *Young v. Kemp,* 760 F.2d 1097 (11th Cir.1985) supports his double jeopardy contention. We think Petitioner's reliance on *Young v. Kemp* is misguided. *Young v. Kemp* involved a complex procedural history. Young was tried and convicted of murder, armed robbery and robbery by intimidation arising out of a fight with his banker over a loan. After the shooting, Young took a wallet from the victim's back pants pocket and left the scene of the crime. Pursuant to Georgia's

bifurcated death sentencing procedure, Young, after trial and conviction, was sentenced to death after the jury found that he was guilty beyond a reasonable doubt of two statutory aggravating factors. After exhausting his state remedies, he filed a habeas corpus petition in district court alleging ineffective assistance of counsel at both the guilt and sentencing phases, and, second, that the evidence adduced at trial was insufficient to support either aggravating circumstance found by the jury. The district court ruled that his trial counsel had been reasonably effective at the guilt phase, but had been constitutionally ineffective at the sentencing phase. In addition, the district court agreed with the Petitioner that the evidence was insufficient to support either of the statutory aggravating circumstances, finding there was no evidence to show that he had formed the intent to rob his victim prior to killing him. The district court granted the writ, the state appealed, and the Petitioner cross-appealed from the denial of his other claims.

On appeal the Circuit in *Young v. Zant,* 677 F.2d 792 (11th Cir.1982) (*Young I*) explicitly ruled that Young's counsel provided ineffective assistance during the guilt/innocence phase of the trial as well as at the sentencing phase, thus reversing the district court's denial of the writ with respect to the guilt phase. However, regarding the district court's holding that there was insufficient evidence to support the statutory aggravating factors, the Court in *Young I* made no explicit determination.

After the decision in *Young I,* the defendant was reindicted by a Green County, Georgia grand jury, again charged with murder, armed robbery and robbery by intimidation, and again informed that the state would seek the death penalty utilizing the two aggravating circumstances alleged in the first trial, and submitting to the jury a third new aggravating circumstance. Petitioner pleaded double jeopardy arguing that the federal district court's insufficiency finding amounted to a form of jeopardy, citing both *Burkes* and *Bullington.* The claim was overruled by the trial court, and the Georgia Supreme Court agreed with

the trial court finding no double jeopardy bar to the imposition of a new death sentence based upon the same aggravating circumstances and factors alleged in the first case. The Petitioner filed in district court a motion to enforce judgment in his original federal habeas corpus proceeding, arguing that the state's attempt to impose the death penalty would violate the double jeopardy clause in light of the district court's prior ruling. The district court declined to enforce its prior habeas ruling, suggesting instead that it was appropriate for the Court of Appeals to determine the validity of the double jeopardy claim because the decision would turn in large measure upon the meaning of the previous decision in *Young I.*

The Court of Appeals, in an opinion by Judge Anderson, concluded that "the previous judgment of this court left intact the district court's finding of insufficient evidence to support the death sentence." *Young v. Kemp, supra,* 760 F.2d at 1101 (*Young II*). Thus it found that the double jeopardy principles announced in *Burkes* and *Bullington* prevented the state from seeking the death penalty at Young's retrial. The Court analyzed at length the effect of its opinion in *Young I* on the validity of the district court's finding of insufficient evidence, and what the double jeopardy implications of the district court's holding would be. The Court took pains however to distinguish that case from one where a finding of constitutional insufficiency clearly would be reviewable:

> In the first instance, it is important to ask whether a finding of constitutional insufficiency is reviewable at all, that is, whether double jeopardy attaches as soon as a court makes its determination of insufficiency. This court has assumed otherwise—that it *can* reverse a federal district court's habeas determination of insufficient evidence—and it has done so when it found the lower court to be in error. *Martin v. Alabama,* 730 F.2d 721, 723 (11th Cir.1984). At first blush, this might seem to be at odds with the general proposition that a judgment of

acquittal amounts to former jeopardy. However, where a reviewing court is assessing the sufficiency of the evidence in a case in which the defendant was originally convicted in the trial court (e.g., all federal habeas proceedings), a reversal of the reviewing court's insufficiency finding would not result in a *retrial* of the defendant. While a jury verdict of acquittal is absolutely final, *see Burkes v. United States*, 437 U.S. 1, 16, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978), a judgment of acquittal after a jury conviction or an appellate reversal on the basis of insufficient evidence does not always amount to former jeopardy. There is a narrow exception in cases where an original jury verdict of guilty is set aside and a judgment of acquittal is entered on sufficiency of the evidence grounds either by the trial judge or by an intermediate appellate court. In such a case, it has been held that double jeopardy does not preclude a subsequent reversal on appeal of such a judgment of acquittal, because the appellate reversal would not result in a retrial but rather in a reinstatement of the jury's guilty finding ... (emphasis in original).

760 F.2d at 1101, n. 5.

The facts in the instant case fall far closer to the circumstances described in the footnote in *Young II.*

That the bar against double jeopardy is designed to protect a defendant from multiple trials was underscored by the Supreme Court in *United States v. Wilson*, 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975). In *Wilson* the trial court dismissed the indictment after the defendant had been found guilty upon trial by jury. The indictment was dismissed on the ground that the delay between the offense and the indictment had denied the defendant the opportunity for a fair trial. The government sought to appeal the dismissal of the indictment and the Supreme Court ruled that the appeal was not barred by double jeopardy. The Court held that the constitutional protection from government appeals attaches only where there is a danger of subjecting the defendant to a second trial for the same offense. In reaching the conclusion the Court pointed to various circumstances where it had held that an order favoring the defendant could constitutionally be appealed by the government. In each of those cases, the common thread is that appellate review would not have subjected the defendant to a second trial. Like the defendant in *Wilson*, Petitioner has enjoyed a post-verdict collateral attack ruling entered in his favor by a trial judge. The State was able to challenge the ruling and the Florida Supreme Court was able to correct what it considered to be an erroneous finding—all without subjecting the Petitioner to the "harassment traditionally associated with multiple prosecutions." *Wilson, supra,* at 352, 95 S.Ct. at 1026. Nothing in *Arizona v. Rumsey*, 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984), is contrary to this conclusion. There, the Court explained why its opinion in *Wilson* had no application to the case before it.

> No double jeopardy problem was presented in *Wilson* because the appellate court upon reviewing asserted legal errors of the trial judge could simply order the jury's guilty verdict reinstated; no new fact finding would be necessary and the defendant therefore would not be twice placed in jeopardy.

*Arizona v. Rumsey*, 104 S.Ct. at 2311. *See also United States v. Martinez*, 763 F.2d 1297, 1309-11 (11th Cir.1985). By contrast, in *Arizona v. Rumsey*, the defendant had been acquitted of the death penalty; there was no verdict of guilt for the appellate court to reinstate. The death penalty could only be imposed in a second sentencing proceeding and it is this second trial after an acquittal which the double jeopardy clause prohibits. In short we do not believe that double jeopardy has been implicated here.

## IV.

 A. Petitioner's next contention is that the trial judge and the Florida Supreme Court improperly applied Section 921.141(5)(h), Florida Statute, establishing as an aggravating circumstance that a

homicide was "especially heinous, atrocious or cruel" in the instant case. He claims that as applied here that aggravating factor was unconstitutionally vague and overbroad because the actual killings were committed by Ferguson and Francois and not by him. Petitioner cites not only *Enmund* but also *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), where the Supreme Court observed that the death sentence must relate to the relevant facts and circumstances of the case and the character record of the individual offender. At the core, Petitioner seems to suggest that the Florida courts improperly applied this aggravating factor based not upon the conduct, motive and intent of the Petitioner, but rather upon that of his co-conspirators', and thus that the application of this factor denuded this sentence of an individual and particularized analysis of his conduct. This argument is really a variation of the basic *Enmund* argument. For the reasons we have already outlined at great length in Part II of this opinion, we reject it and find no error in the application of this factor to this case.

In applying the "especially heinous, atrocious or cruel" standard here, the Florida Supreme Court noted that it was influenced by the magnitude of the criminal conduct, "[t]he calculated slaughter of six individuals and attempted slaughter of two others," what had been characterized by one of the co-felons as "the St. Valentine's Day massacre." *White v. State*, 403 So.2d at 339. The Supreme Court of Florida reiterated the standard which it had set out in *Cooper v. State*, 336 So.2d 1133 (Fla.1976), *cert. denied*, 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 239 (1977), noting that while all murders may be heinous, this aggravating factor "contemplates the conscienceless, pitiless or unnecessarily torturous crime which is accompanied by such additional acts as to set it apart from the norm of capital felonies." *Id.* at 338. The *Cooper* case involved a situation where defendant shot the victim immediately upon confronting him and the victim died instantly, painlessly and without any additional act which

made the killing "heinous" within the meaning of the statute.

Here, the Florida Court found that the victims "were required to submit to a protracted ordeal during which time they undoubtedly agonized over the prospect of being murdered." 403 So.2d 338. The trial judge specifically made written findings on this point. The protracted and brutal nature of the ordeal endured by the victims, support, we think, the appropriateness of labeling the crimes and White's conduct "especially heinous, atrocious or cruel." *Mills v. State*, 462 So.2d 1075, 1080–81 (Fla.), *cert. denied*, —— U.S. ——, 105 S.Ct. 3538, 87 L.Ed.2d 661 (1985); *Henderson v. State*, 463 So.2d 196, 201 (Fla.), *cert. denied*, —— U.S. ——, 105 S.Ct. 3542, 87 L.Ed.2d 665 (1985). The Supreme Court of Florida could fairly apply the "especially heinous, atrocious or cruel" factor to the instant case and to the conduct of this Petitioner.

B. Finally, as a third variation of the *Enmund* theme, Petitioner contends that the death sentence was unconstitutionally infirm because the trial court and the Florida Supreme Court failed to give weight to the non-statutory mitigating circumstance that he was a non-shooter.

The trial judge made written findings relating to mitigating circumstances as specified by Section 921.141(6), Florida Statute Annotated (1985). Judge Fuller rejected Petitioner's claim of mitigation and concluded that "no mitigating circumstances exist[ed] which could possibly *outweigh* the aggravating circumstances." (emphasis added). (T.R. at 194). As we've stated already, the Florida Supreme Court made a thorough and individualized analysis of this defendant's participation. To suggest that they did not consider this non-statutory mitigating factor misapprehends the nature and thrust of their opinions. What the state courts found was that Petitioner's status as a non-shooter was insufficient to outweigh the aggravating circumstances. Petitioner now claims that the refusal of the Florida courts to label his non-shooter

status as a mitigating factor somehow constitutes constitutional error. We disagree. We think that what Petitioner confuses is the failure of a sentencing court to consider that evidence at all with the proper function of a sentencing court which is to determine the weight to be accorded such evidence.

Petitioner relies upon *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), to support his argument that the failure to find the existence of this non-statutory mitigating circumstance error. While *Eddings* clearly provides that a sentencing court must hear all of the evidence proffered by a defendant in mitigation, the decision as to whether a mitigating circumstance has been proven and the weight to be given rests with the sentencing court. *Eddings, supra,* at 114–115, 102 S.Ct. at 876–77. In the instant case the trial judge concluded that Petitioner's proffered evidence as to his level of participation and corresponding degree of culpability failed to establish a mitigating circumstance. It is surely the domain of the state trial court to determine the existence and the weight to be given the mitigating circumstance. *See, Stano v. State,* 460 So.2d 890, 894 (Fla.1984), *cert. denied,* 456 U.S. 984, 105 S.Ct. 2347, 85 L.Ed.2d 863 (1985); *Smith v. State,* 407 So.2d 894, 901–903 (Fla.1981), *cert. denied,* 456 U.S. 984, 102 S.Ct. 2260, 72 L.Ed.2d 864 (1982); *Lemon v. State,* 456 So.2d 885, 887 (Fla.), *cert. denied,* — U.S. —, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1984).

"Mitigating circumstances must, in some way, ameliorate the enormity of the defendant's guilt." *Eutzy v. State,* 458 So.2d 755, 759 (Fla.1984), *cert. denied,* — U.S. —, 105 S.Ct. 2062, 85 L.Ed.2d 336 (1985). It seems clear to us that the state courts did not ignore the evidence presented in mitigation, but rather found Petitioner's characterization of his role in the killings as "minor" unconvincing and concluded that this evidence failed to rise to the level of mitigation. *White v. State,* 403 So.2d 331, 339 (Fla.1981), *cert. denied,* 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983). *See also, Shriner v. Wainwright,*

715 F.2d 1452, 1457 (11th Cir.1983), *cert. denied,* 465 U.S. 1051, 104 S.Ct. 1328, 79 L.Ed.2d 723 (1984); and *Lusk v. State,* 446 So.2d 1038, 1043, (Fla.) *cert. denied,* — U.S. —, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984). Thus we must reject Petitioner's argument and conclude that the Florida courts did not violate Petitioner's constitutional rights in this regard.

For all of the reasons which this Court has enumerated at great length, it is hereby

ORDERED AND ADJUDGED that Petitioner Beauford White's application for a writ of habeas corpus must be and is DENIED.